**Gregory Scott JOHNSON, Appellant,**

v.

**STATE of Indiana, Appellee.**

No. 48S00–8611–CR–992.

Supreme Court of Indiana.

Jan. 27, 1992.

William Byer, Jr., Byer & Gaus, Anderson, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Indianapolis, for appellee.

DeBRULER, Judge.

Appellant Gregory Scott Johnson was charged in Count I with felony murder pursuant to I.C. 35–42–1–1(2) in having killed Ruby Hutslar by striking her with a blunt instrument and kicking and hitting her during the commission of a burglary. In Count II, he was charged pursuant to I.C. 35–43–1–1(a) with having knowingly damaged the dwelling of the alleged victim by means of fire, a class B felony. In a separate Count III, the prosecution sought the death sentence by alleging pursuant to I.C. 35–50–2–9(b)(1), the aggravating circumstance that the killing had been done intentionally while committing the crimes of burglary and arson.

A trial by jury resulted in verdicts of guilty as charged in both Count I and Count II. A judgment of conviction was then entered. Three days later the jury reconvened for the hearing regarding sentencing recommendation. Following the presentation of evidence, the jury retired and then returned a verdict recommending that the death sentence be imposed.

A month later the court held the sentencing hearing, during which the evidence and arguments were heard and concluded. The trial court then made an express and written finding that the State proved the aggravating circumstance to the court beyond a reasonable doubt. The court also considered all categories of mitigating factors, noting that appellant had a history of prior criminal conduct and had consumed some drugs and alcohol, but found that no mitigating circumstances existed and imposed the death penalty for the murder. The court also imposed a ten-year sentence for arson.

Johnson raises numerous issues on appeal which we have consolidated and restated as follows:

 I. Whether the trial court erred by admitting evidence of statements made by appellant when arrested and when interrogated later at the stationhouse;

 II. Whether the evidence was sufficient to prove the criminal intent required on all counts;

 III. Whether it was error to fail to find intoxication at the time of the offense to be a mitigating circumstance;

 IV. Whether a jury instruction given at the penalty phase was erroneous because it omitted reference to the possible penalties for arson;

V. Whether the trial court erred by refusing to grant a mistrial when evidence of other arsons was injected by the prosecution;

VI. Whether the trial court erred when denying a motion for change of judge;

VII. Whether the trial court erred in refusing to grant pre-trial and in-trial motions to require the prosecution to produce police and fire investigative reports;

VIII. Whether the trial court was in error when admitting evidence describing the deceased victim as having a scared look;

IX. Whether it was error at the penalty phase to admit evidence of jail disciplinary reports;

X. Whether it was error to admit evidence at the penalty phase hearing of appellant's confession to four arsons;

XI. Whether appellant was afforded the effective assistance of counsel at the penalty phase hearing before the jury;

XII. Whether it was error to deny a defense motion to dismiss Count III, seeking the death penalty; and

XIII. Whether the death sentence is appropriate in this case.

In order to support its case, the prosecution submitted the following evidence. A boy delivering morning papers at about 6 a.m. on June 23, 1985, in Anderson, Indiana passed the house of the alleged victim, Ruby Hutslar, age 82. He saw smoke coming out from under the eaves of her roof. Alarmed, he roused a neighbor and reported the fact. He and two passersby then attempted to enter the house, but found the main front door locked. They broke open a front window of the house, but were unable to enter. They went to the back of the house and found the back door open, but were unable to enter because of the heat and smoke. A basement window was observed to have been unscrewed, broken and removed.

At 6:30, firemen arrived and observed one pane of glass in the front door broken. One was unable to reach in to attempt to unlock the door because of the intense heat inside. Fully equipped, a fireman broke open the front door, entered the living room crawling, and found Ruby Hutslar on the floor, six feet from the front door. She was carried out of the house. Efforts to resuscitate her at the scene and later at the hospital were not successful. The cause of her death was determined upon autopsy to be blunt force injuries to the head, neck and chest. She had not died of smoke inhalation or burning.

The fire had started in the center of the house and had climbed a stairway and concentrated in the attic. The fire was put out in about a half hour. A closet and the stairway on the first floor burned but the rest of the first floor and its contents suffered mostly smoke and heat damage. It was observed that the drawers in the furniture had been pulled out and some dumped out. Some small boxes and containers had been opened and their contents dumped out. The contents of a clothes closet were scattered about and the mattress had been removed from a bed. The house was in disarray, and this had not all been caused by the work of the firemen. An investigation into the cause of the fire resulted in the opinion that the fire had been set.

At approximately 6:40 a.m. a police radio broadcast instructed officers to be on the lookout for appellant Johnson because he was suspected of setting several fires in the area of the Hutslar residence. Within minutes appellant was seen by Detective Miller to be standing on the street along with others, watching the fighting of the Hutslar fire. Appellant was known to this officer, who approached him, spoke to him and observed that his eyes were bloodshot, his breath smelled of alcohol, and he was unsteady on his feet, nervous, and anxious. He appeared to be dirty and in disarray. Another onlooker testified that appellant had approached and stood very close behind him and was sweaty. When the onlooker moved sideways, appellant did also, so as to stand close behind him again. The officer placed appellant under arrest for public intoxication.

Appellant made statements at the scene. Officer Miller testified that after being ar-

rested, appellant was searched, placed in a squad car and there read his Miranda rights for the first time. Appellant became agitated and cursed and said he understood his rights. The officer testified that in his opinion appellant was then intoxicated from a slight to moderate extent. Appellant and his girlfriend testified at a hearing on suppression of statements that appellant was an alcoholic, drinking heavily each day, and that during the twelve hour period preceding his arrest he ingested huge quantities of alcohol and a variety of drugs. A pharmacologist testifying for appellant testified that it would not be possible to accurately predict the effect of the ingestion of the substances as described by appellant, but was able to say that a person who had done so would suffer loss of muscle coordination and that appellant would have had a blood alcohol level of .15 at the time of his arrest and .10 at 8:20 when he signed a waiver of rights form.

Within ten minutes of the arrest, Officer Adams arrived on the scene. He testified that appellant was then in the squad car, in cuffs, and was kicking hard on the inside. Adams went over and asked what was wrong, and saw that appellant appeared "somewhat" impaired by alcohol or drugs. He said "something about him not having a chance and about his upbringing," and "Wisehart did not kill the bitch, I did." Adams then asked, "Did you Scott?", whereupon appellant replied, "No, but if that's the way you fuckers want to play." The statement referred to unrelated prior events in which appellant had provided testimony for the prosecution at the trial of his friend Wisehart, for the murder of another woman.

Appellant was transported to the stationhouse where at 8:20 a.m. he was given his Miranda rights for the second time, this time by Captain Hanlon, his interrogator. He then signed a written acknowledgement and waiver of rights. He denied involvement in the Hutslar fire, but gave four written statements, confessing to having set or having attempted to set four fires in the area in recent times. At the time of the written rights waiver appellant smelled strongly of alcohol, his eyes were a little

bloodshot, and he manifested anger. Periodically appellant was left alone during the interrogation and would sleep for a while. During the morning he was told that Mrs. Hutslar had died. At noon he vomited. He received food, drinks, and cigarettes. He did not appear exhausted, and continued sobering up as the day went on.

At 3:30 p.m. Hanlon commenced an interrogation regarding the Hutslar fire by asking if the Hutslar fire was not an attempt on appellant's part to join his friend Mark, who was then in prison, awaiting execution, as the result of a conviction based upon appellant's testimony. Appellant responded by placing his head in his hands and becoming emotional. He then admitted breaking into the Hutslar house. A full incriminating statement followed that was completed at 5:45 p.m. In it appellant stated that he broke the glass in the pane on the front door, entered, immediately encountered Ms. Hutslar who collapsed on the floor breathing heavily. He then searched out and took a watch and silver dollars, and in checking out some noises outside, stepped on her cheek and neck twice. He then found some matches, started the fire, and ran out the back door. He threw away the watch and coins and then joined those watching the firemen at the house, at which point he was arrested.

## I.

Appellant first contends that the trial court erred in denying his motion to suppress, and his subsequent trial objections, challenging the admissibility of his scene-of-arrest statements and his later statements made at the stationhouse. He claims that the State failed to show in response to those objections, as required by the *Miranda* decision, that he knowingly and intelligently waived his *Miranda* rights and voluntarily gave those statements, because he was intoxicated.

■ Statements made to police or to their agents by those in police custody in response to police interrogation are inadmissible at trial, unless the State sustains its burden to prove beyond a reasonable

doubt, that they were preceded by a knowing and voluntary waiver of the privilege against self-incrimination and the right to counsel and were themselves voluntarily given. *Jackson v. State* (1980), 274 Ind. 297, 411 N.E.2d 609; *Williams v. State* (1986), Ind., 489 N.E.2d 53. In determining whether a statement or waiver was voluntarily given, we look to all the circumstances surrounding its giving to determine whether it was the product of any violence, threats, promises, or other improper influence. *Ortiz v. State* (1976), 265 Ind. 549, 356 N.E.2d 1188. The appropriate standard for evaluating the voluntariness of a waiver of rights is the totality of the circumstances test. *Holleman v. State* (1980), 272 Ind. 534, 400 N.E.2d 123.

■■■ Alcohol and drug intoxication does have a lessening effect upon the ability of the human being to control his or her mental and physical activities. Drugs can produce a physiological and psychological effect which is so severe as to render a person unconscious as to what he is saying or otherwise communicating and thus render a confession inadmissible. The state of intoxication, like mental illness, is subject to change and variation and is not an absolute bar to free and voluntary decision making as such it is only one of several factors which must be weighed in determining whether a waiver or confession was the product of an irrational mind or one which was overborne by coercion. *Bean v. State* (1978), 267 Ind. 528, 371 N.E.2d 713. In reviewing the trial court's ruling upon the issue, we will consider only the evidence which supports the ruling when the evidence is in conflict, as well as any unrefuted evidence in the defendant's favor. *Jackson v. State, supra.*

■■ In *Bundy v. State* (1981), Ind., 427 N.E.2d 1077,. the defendant was under the influence when first arrested and read his rights, but was nevertheless able to walk and climb stairs unassisted and to speak without slurring. An hour later at the stationhouse, he was again advised of his rights, and seven hours later he gave a confession during interrogation. The determination that his waiver and statement

had been voluntary was upheld. Here by contrast, appellant was unsteady when he was arrested and at times mumbled and grew violent. He was undoubtedly more intoxicated and impaired than was Bundy. However, at the same time he retained the capacity to be fully cognizant of the activity on the street, and chose to join the onlookers while making carefully measured movements to shield himself from view. Numerous times, although he still smelled strongly of alcohol, he responded normally and appropriately, both physically and verbally, to the police officers who confronted him. There is no claim that the police used tactics more coercive than direct questioning in their requests for waivers and in their interrogations. Upon review of the evidence we are satisfied that the ruling that appellant's verbal and written waivers of rights and choice to confess were freely self-determined is supported by substantial evidence of probative value, and that the on-the-scene and stationhouse statements were properly admitted for consideration by the jury.

## II.

Appellant contends that the evidence serving to prove the state of mind elements required under the three Counts was wholly insufficient to warrant the verdicts of guilty, the jury recommendation of death, and the judge's imposition of the death penalty. Pursuant to these Counts, at the various stages of the trial, the State was required to prove an intent to kill, one to steal, and one to damage by fire, at the time of the criminal conduct charged to the satisfaction of the judge or jury to a moral certainty beyond a reasonable doubt. The contention is that the evidence was insufficient to sustain the convictions and the aggravating circumstance because it showed that he was so intoxicated as to be unable to form such required states of mind.

■■■ In Indiana, voluntary intoxication can be offered as a defense to any crime. I.C. 35–41–3–5; *Terry v. State* (1984), Ind., 465 N.E.2d 1085. It follows a fortiori from the provision of the death sentence statute

defining the aggravating circumstance applicable in this case, namely, I.C. 35–50–2–9(b)(1), that voluntary intoxication was properly asserted in this case as a defense to such aggravating circumstance, and as a mitigating circumstance as well. The basic assumption underlying the defense is that drug and alcohol intoxication may be so severe as to prevent a person from forming a criminal intent, yet not so severe as to prevent that person from performing acts required to commit the crime. *Street v. State* (1991), Ind., 567 N.E.2d 102; *Shackleford v. State* (1976), 264 Ind. 698, 349 N.E.2d 150. The trial court was satisfied in this case that appellant had asserted the defense and that a satisfactory predicate had been established for the defense. The trial court placed the issue of intoxication before jury by way of a special instruction.

■■■ In reviewing the question of the sufficiency of evidence of the elements of an offense or of an aggravating circumstance, including the criminal intent element thereof, we do not weigh evidence nor resolve questions of credibility, but look to the evidence and reasonable inferences therefrom which support the resulting guilty verdict, the resulting death recommendation, and the resulting sentence of death. Such determinations will be affirmed, if from that viewpoint there is evidence from which a reasonable trier of fact could infer guilt beyond a reasonable doubt. *Melendez v. State* (1987), Ind., 511 N.E.2d 454.

■■■ In this case, evidence of the extent of mental incapacity due to intoxication was conflicting. As noted above in dealing with the issue of intoxication with respect to the rights waivers, at the time of arrest, appellant was suffering from a moderate degree of impairment. He was erratic in some movements, flushed, and red-eyed. He grew excited. There was evidence by the defense that appellant drank heavily on a daily basis and had had a great deal to drink in the period before the fire. On the other hand, appellant described how he planned to break into the Hutslar home knowing that it was occupied at the time by its elderly resident. He proceeded to gath-

er gloves and tools for doing so. After walking around the area several times, he approached the house and cut the telephone line. He broke in through the door, and almost immediately confronted the victim who was standing but a few feet away. He then beat and kicked her to death. He then proceeded to locate and pocket some valuable items from the house and to set the fire. We conclude that the evidence was such that a rational trier of fact would be warranted in concluding to a certainty beyond a reasonable doubt that appellant was suffering from a mental incapacity but that it was not so severe as to render him unable to form the requisite criminal intents to kill, burn, and steal, and that he in fact did form and possess those intents and purposes.

### III.

■■■ Appellant next contends that the trial court committed error when determining that his state of intoxication did not constitute a mitigating factor and did not apply when imposing the penalty of death. Intoxication at the time of the offense, when proven to be of such a degree as to substantially impair the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, is a statutory mitigating circumstance which must be given mitigating weight in the process of determining the appropriateness of the death penalty. I.C. 35–50–2–9(c)(6).

The trial court stated with respect to this mitigator:

The defendant had consumed some alcohol and drugs, but his resulting condition did not substantially impair his capacity to appreciate the criminality of his conduct. This mitigating factor does not apply.

This finding shows that the trial court properly recognized intoxication as an issue at sentencing, considered all of the relevant and material evidence of intoxication, and resolved the conflict in evidence in such a manner as to find that the level of impairment from alcohol and drugs did not reach that level requiring it to be given mitigat-

ing value in the balancing process. This finding rejects much evidence of the level of impairment due to intoxication and we are not in accord with it. *Davis v. State* (1985), Ind., 477 N.E.2d 889.

■ As noted above it is clear that appellant was appreciably impaired, yet was able to formulate a plan to break into a specific old woman's house and steal her money, to gather and use gloves and hand tools in the execution of that plan, to cut the telephone line, to search the premises and take articles of value, to set a fire in the house, and to make an escape. The evidence of intoxication, however, despite the role properly accorded it here in the determination of guilt and the existence of the aggravating circumstance, must be awarded a mitigating value in determining the propriety of the death penalty. The determination of mitigating circumstances is part of the death sentence process, and on appeal is subject to greater scrutiny and ordinary rules apply as guidelines. *Cooper v. State* (1989), Ind., 540 N.E.2d 1216. The evidence is uncontradicted that appellant was an alcoholic since childhood, and had been drinking heavily before the crime. In the months before the crime, he set at least four fires without purpose or hope of gain. Within an hour or two of the crime, he was arrested for public intoxication. His eyes were bloodshot, and he smelled strongly of alcohol, a smell which persisted for several hours. He was violent and vociferous when confined. There is no conflict with respect to this evidence, and we find the trial court was in error in failing to find that this mitigating circumstance was present and entitled to some weight in the determination of whether death is appropriate. The legal result of this error is set forth in Part XIII following.

### IV

■ Appellant next contends that the trial court erred in reading the following penalty phase instruction to the jury:

You, the jury, are vested with the power by statute to recommend to this court whether or not the defendant is to be ... is to receive the death penalty. Al-

though your recommendation is not binding upon this court, it is a very valuable contribution in the decision-making process of this court. In order that you make a well reasoned recommendation, you need to be aware of the available alternatives. The sentences available for the conviction of murder are, one, the defendant can be sentenced to death or, two, imprisoned for a fixed term of 40 years with not more than 20 years added for aggravating circumstances, and not more than 10 years subtracted for mitigating circumstances. In addition, he may be fined not more than $10,000.00. If the defendant is sentenced to a term of imprisonment by this court, he may receive credit time ... 'he may receive credit time, which at the earliest could allow him to be released on parole after serving one-half the term of imprisonment imposed by this court.

The pertinent part of the objection of defense counsel to the instruction was made in the following manner:

MR. LONG:

We would object to State's Instruction No. 6. Number one, it does not mention any possible penalty for the arson conviction.

\* \* \* \* \* \*

THE COURT: The objection is overruled, and the Court will give Number 6....

Appellant maintains on appeal that the error in this instruction is its failure to include language pertaining to the arson conviction. In *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, an instruction of this type was given by agreement of the defendant after the jury returned into open court during deliberations and requested information about whether a person receiving a life sentence could be released on parole. The Court, despite the fact that the issue had not been raised and preserved for appeal, ruled:

The ultimate determination cannot be made in a vacuum. Hence, recommendations, if they are to have relevance, must be arrived at in the light of available alternatives. Given the task of the jury at this stage of the hearing, it is alto-

gether proper that they be fully aware of the consequences of a prison sentence as well as of the consequences of a death sentence.

*Brewer,* 275 Ind. at 373, 417 N.E.2d at 909. Appellant would have the instruction condemned because it did not make the jury fully aware of the consequences of a prison sentence, because it did not include the potential concurrent or consecutive sentences for arson.

 The jury recommendation to the court on whether to impose the death penalty is undoubtedly an important part of the death sentencing process. Its relevance and value to the process is dependent primarily upon whether it has been arrived at by the jury by proper application of the criteria required by the death sentence statute. *Williams v. State* (1988), Ind., 525 N.E.2d 1238. Mention of the possible arson sentences in this instruction would have called for the jury to speculate upon the question of what the judge might consider appropriate for that separate offense. Any diminution in the relevance and value of the jury recommendation as a whole from the lack of such an effort at prediction would be de minimis. It was not error to restrict this instruction to the more immediate potential consequences, i.e., those stemming from the verdict of guilty of murder.

### V.

 Appellant next claims that the trial court was in error in refusing to declare a mistrial during the testimony of city detective Miller. Miller had arrested appellant for public intoxication after seeing him in a group on the street watching the fire department battling the fire at Hutslar's home. When asked whether he knew appellant, he replied:

> And I also ... yes. I also was aware of the fact that he was being sought after or was a possible suspect in some arsons in the area.

Defense counsel objected. The trial court sustained the objection and instructed the jury to disregard the answer. The prosecutor assured the court that he had no inten-

tion of getting the witness to so testify contrary to a pre-trial motion[6] in limine which had specifically prohibited references to such prior events. A defense motion for mistrial was then denied.

Miller's answer was improper. Such answers pose a persistent problem to the courts. The information supplied by it to the jury had no bearing upon appellant's guilt or innocence, and would tend to prejudice his case unfairly. *Limp v. State* (1982), Ind., 431 N.E.2d 784. The level of prejudice from the answer is not as great as the level of prejudice stemming from the answer considered grounds for mistrial in *White v. State* (1971), 257 Ind. 64, 272 N.E.2d 312, where an officer in a theft case testified that the defendant "was brought into our department with reference to an armed robbery case." The level here is instead about the same as that stemming from the improper testimony of an officer that he believed the testimony of the child witness in a molesting case, or that stemming from the improper testimony of an officer that the defendant had previously been arrested. In each instance the vestigial prejudice of the impropriety was deemed not to warrant a mistrial. *Henson v. State* (1987), Ind., 514 N.E.2d 1064; *Limp,* 431 N.E.2d 784. As in those cases, the misconduct of the police officer here was an isolated instance. The prosecutor denied intentional wrongdoing and there is no reason to disbelieve the denial, and, given appellant's confession the evidence of guilt was strong. Under the circumstances, any vestiges of prejudice surviving the admonition of the court would be small and could not have had that kind of persuasive effect warranting a new trial.

### VI.

 Appellant insists that the trial court committed error in failing to grant his verified motion for change of judge. This motion was filed in a timely manner and its allegations of bias and prejudice of the judge were supported by affidavit as required by law. I.C. 35–36–5–2. Ind. Crim.Rule 12.

The supporting affidavit chronicled an event occurring two years before appellant's arrest on this charge at the time of the trial of one Mark Wisehart for the murder of one Marjorie Johnson. On that occasion, counsel for Wisehart told Judge Newman, the judge in this case, that he had information from two sources that appellant "was involved" in the murder of Marjorie Johnson, and repeated the statement to the judge after appellant's arrest on this charge of murder.

Assuming the facts asserted in the affidavit to be true, they do not give rise to a reasonable inference that the judge held a biased or prejudiced attitude against appellant. The first statement may have been made in aid of a client to deflect attention away from that client during his trial. The second statement may have been courthouse gossip. Both were surely very vague, and totally unsubstantiated. As such, they do not evidence an attitude of the judge, a legal prerequisite for such motions. *Thomas v. State* (1985), Ind., 486 N.E.2d 531. The motion was therefore properly denied.

## VII.

■ Appellant contends that the trial court committed error in denying his repeated requests before and during trial for production of police and fire department reports. The following portion of the pretrial motion of the defense to compel discovery of written documents was denied, and later during the pre-trial period the trial judge refused to examine the same documents in camera himself to determine whether they constituted exculpatory evidence.

g. Statements of Police Officers involved in the investigation who have compiled written reports of their activities which they have signed and submitted to their supervisors in a typed format.

h. Written statements of members of the Anderson Fire Department who are listed as witnesses for the State of Indiana which reflect a summarization of their activities in investigation of the

charges herein, which are type written, signed by the various firefighters and submitted to their superiors.

At trial, during cross-examination of a police officer who had made a police report, the parties entered into a stipulation describing the nature of the documents sought:

These are commonly called police reports. That in the normal course of business at the Anderson Police Department they are submitted from the officer to his supervisor, who approves them, then they are commonly sent to the prosecutor's office. A copy is kept in the records department of the Anderson Police Department. That these records go to the prosecutor, who reviews them and then makes the decision whether charges are filed. That these reports are available to each officer who commonly ... and I believe in every case so far ... has reviewed them at some point before testifying.

The trial court refused to order the production of the documents during cross-examination, but following the trial ordered them sealed and included in the record of proceedings on appeal.

In *State ex rel. Keaton v. Circuit Court of Rush County* (1985), Ind., 475 N.E.2d 1146, this Court held that courts are powerless to order production of complete, verbatim police reports, as they constitute the work product of the prosecutor. When considering the defense motions for production, together with the stipulation with respect to the nature of the documents targeted by such motions, it cannot but be concluded that appellant sought full control and possession of entire reports and not just the opportunity to have a chance to examine them, and that the reports had those characteristics required to bring them within the protection of the work product privilege as envisioned in *Keaton.* Thus, the ruling of the court was consonant with *Keaton,* and not error.

■ As conceded by the State, the prosecution had throughout the preparation for trial and the trial itself the constitutional mandate to turn over exculpatory

evidence in its possession. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Presumably in recognition of the right of the accused to exculpatory evidence, the trial court ordered the reports of nineteen officers sealed and transmitted to this Court. Appellate counsel has had access to such reports, and has found the following potentially favorable: a description of the use of a tracking dog; a description of events within the chain of custody of blood samples of the victim; the statement of a witness that appellant appeared drunk on the morning of his arrest; and the statement of a witness that she was unable to identify a ring as belonging to the victim. In light of the State's evidence, and appellant's own contribution to that evidence, there is no reasonable probability that the proceedings at the guilt or innocence stage, the jury recommendation stage, or the judge sentencing stage, would have been resolved differently. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Reversal is therefore not mandated on the basis of the material withheld by the prosecutor.

### VIII.

 During the trial, Sergeant Dykes of the fire department testified that when he first encountered the victim in her home after the attack she "had a ... scared look." Defense counsel objected on the basis that the comment was an impermissible opinion of the victim's state of mind. The objection was overruled, and such ruling is assigned here as error.

 In *Strickland v. State* (1977), 265 Ind. 664, 359 N.E.2d 244, the defendant was charged with murder, one of the elements of which at the time was malice. The trial court was held to have properly applied the rule against opinions of one person as to the state of mind of another when precluding a witness from answering the question, "to ... your knowledge ... is there any fact ... that would lead you to believe that [the defendant] had any malice [toward the victim]." The Court explained:

Generally, the opinion rule excludes an eyewitness's conclusion as to the state of mind of another person. This is the province of the jury, which is equally able to infer a persons's state of mind or emotions from testimony limited to particular facts and circumstances observed by the witness. Although there is authority for a different view, the jury determines the psychological facts; the witness is limited in his testimony to the indicia he observed.

*Strickland*, 265 Ind. at 669, 359 N.E.2d at 248. The rule restricts the witness to observable fact, leaving any appropriate conclusions as to intent, belief, or feelings to the trier of fact.

Here, the witness Dykes explained:

Just ... the lady looked ... had a ... the eyes wide open. The mouth was open. Just ... the ... I've seen people die in the past, being on the ambulance a lot. This lady had a ... scared look or a ...

... unless you see it, sometimes it's hard to describe, but a lot of people will die peacefully and this person had a look on her face that I had not noticed before in the past.

According to the rule stated in *Strickland*, the fireman should have been restricted in accordance with the tenor of the objection to describing the position and shape of the parts of the victim's face, leaving the jury to draw the conclusion, if any, from those facts. The ruling was error.

 It is not however every trial error which warrants relief, even where the sentence of death is imposed. *Thompson v. State* (1986), Ind., 492 N.E.2d 264. *Brewer*, 275 Ind. 338, 417 N.E.2d 889. An error may be deemed harmless on appeal if it has not prejudiced the substantial rights of appellant. *Lake v. State* (1991), Ind., 565 N.E.2d 332. In light of the overwhelming evidence marshalled by the prosecution this evidentiary error was harmless at all stages of the trial.

Appellant admitted that after gathering gloves, tinsnips and a screwdriver, he entered the residence through the front door by breaking a pane of glass in it with a broom he found there. After entering he immediately confronted Ruby Hutslar, an

82 year-old woman, five feet three inches tall, weighing 90 lbs, who was standing five feet away in her night clothes. She sat back down into a chair, and slumped onto the floor, with eyes open, breathing heavily. He admitted stepping on her chest or neck area as he moved about the room. According to the testimony of the pathologist she died of severe blunt force injuries to the head, neck, and chest. The bones of her nose and cheekbone were fractured, and there was bleeding into and around the brain. The injuries to her head were consistent with those which would result from being repeatedly hit by a broom handle. The larynx, hyoid bone, and cervical spine were fractured and there were twenty fractures of the ribs. These injuries to the neck and chest bore the impression of appellant's shoes. In light of the strength of this case, the error in permitting the fireman to testify that the corpse bore a frightened expression was harmless.

## IX.

■ Appellant presented ten witnesses on his behalf at the penalty phase of the trial before the jury. One such witness was Doris Maxey, Madison County Jailer. On direct examination she testified that appellant had not been a problem at the jail while awaiting trial, and had been somewhat helpful. On cross-examination by the prosecutor, over hearsay and confrontation objections, she was permitted to testify that she was aware that appellant had been "written up" for three violations of the jail rules, namely, attempting to escape, possession of an item that could be used as a weapon, and defacing jail property. On redirect examination she testified that she had no personal knowledge of the facts alleged in the three reports. The reports were not introduced into evidence.

The witness had first hand knowledge that the reports had been made and was subject to full cross-examination with respect to that fact. She had no knowledge of the truth of the facts asserted therein, and could not be cross-examined with respect to them. The evidentiary purpose of presenting the reports in this manner on

cross-examination was to test the knowledge or basis of the witness's opinion that appellant had behaved in confinement. In these particular circumstances, which include the witness's admission that she had no knowledge of the facts alleged in the reports, they were not offered and would not have been received as evidence that he had in fact misbehaved while in confinement. For this purpose, the questioned testimony of the witness about the reports was not hearsay. *Harvey v. State* (1971), 256 Ind. 473, 269 N.E.2d 759; *Wells v. State* (1970), 254 Ind. 608, 261 N.E.2d 865. It was not error to permit this cross-examination.

## X.

■ Following appellant's evidence at the penalty phase hearing before the jury, the prosecution presented the testimony of an officer that approximately four hours after the arrest of appellant, he discussed the location of four previous arsons and directed the officers to those locations. This was permitted over a defense objection that the testimony would be irrelevant and highly prejudicial.

■ As a general rule, evidence of past misconduct is inadmissible in the trial of a criminal case unless it falls within an exception to such rule. *Jarrett v. State* (1984), Ind., 465 N.E.2d 1097. The character of the categories of exception has been recently explained:

> The ultimate test of admissibility is whether or not the evidence of prior misconduct actually has that particular relevance, signified by the legal labels of each category of exception, which relevance is deemed to outweigh the tendency to prejudice the fairness of the proceeding.

*Stewart v. State* (1990), Ind., 555 N.E.2d 121, 124. Here, the State argues that appellant's statements concerning these prior acts was admissible under the exception for proof of intent or state of mind.

At the penalty phase before the jury, the State bore the burden of proving the alleged aggravating circumstance, which in-

cluded the elements of intent to kill, intent to steal, and intent to damage by fire, and of rebutting the defendant's effort to show mitigation through impairment by alcohol and alcoholism. The officer's testimony was relevant and admissible for both purposes.

There is no demonstration that these statements were other than the product of appellant's own free choice. See *Van Cleave v. State* (1987), Ind., 517 N.E.2d 356. They were therefore not inadmissible as the product of official coercion. The officer described appellant as cooperative and helpful at the time. Appellant's defense at all stages of this case was that of intoxication. His confession to these other offenses came within a few hours after the crimes with which he was charged had occurred. The confession provided intricate information describing the four locations of the fires within the city and within the structures involved. Appellant was also able as well at that time to guide the police to the location of each fire. The structures were a house of a relative and three different garages. At two of the locations, where he had been unsuccessful in starting a fire, he was able to point out small charred areas in and about the structures where the attempts had been made. The evidence was probative of intent at the time of the crime. Furthermore, none of these fires was described as causing great danger to any person, and several seem to have involved remote or abandoned structures. The testimony describing the confession was not more prejudicial than probative, and was properly admitted for consideration by the jury at the penalty phase.

## XI.

■ Appellant Johnson next argues that his counsel was constitutionally inadequate at the penalty phase of the trial before the jury. The test required by the sixth amendment to the U.S. Constitution was set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and expressed in *Richardson v. State* (1985), Ind., 476 N.E.2d 497. The proper judicial approach is highly deferential and requires a consideration of the totality of the evidence before the jury. There is a strong presumption that the conduct of defense counsel fell within the wide range of reasonable professional assistance, and a convicted defendant's claim against his counsel requires a showing of deficient performance and resulting prejudice. This approach applies when raising the claim challenging counsel's acts and omissions at the penalty phase of a capital trial before the jury. *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

■ Appellant's argument rests upon the fact that defense counsel did not object to the statements made by the prosecutor during closing arguments at this stage. In that part complained of here, the prosecutor stated:

"And he didn't tell you ... he talked about life imprisonment. There's no life imprisonment here. It's a determined penalty. As I talked to you folks earlier in voir dire examination about determinant penalties ... in this under the new law ... that he may have to serve half the time, and that's in the court's instructions."

Defense counsel cannot be faulted for omitting an objection, absent a good ground. *Kimble v. State* (1983), Ind., 451 N.E.2d 302. Defense counsel sought by motion to prevent the prosecutor from supplying this information to the jury. He then chose to argue in his opening statement that the jury should disregard the notion that appellant would ever again walk the streets in deciding upon its recommendation, since the judge would in all likelihood give a maximum sentence of sixty years and that it was "extremely unlikely that anyone who receives a lengthy prison sentence will be paroled or receive all of his goodtime credit unless and until he is completely rehabilitated." The choice to so argue was a reasonable trial tactic or strategy. It had a reasonable chance of bolstering jury confidence in the capacity of incarceration rather than execution to protect society from further dangerous conduct by appellant even though it carried some downside risk

in that it opened the door under the "invited response" or "invited reply" rule to the above quoted part of the prosecutor's rebuttal statement. Under prevailing law defense counsel's choice to so argue rendered futile any objection thereafter to a logical response properly tailored retaliatory statement of the prosecutor. *U.S. v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *Goodman v. State* (1985), Ind., 479 N.E.2d 513; *Marshall v. State* (1982), Ind., 438 N.E.2d 986. In a nutshell, this choice by defense counsel and the later omission of an objection, when considered with the entirety of the evidence, is insufficient to satisfy the burden of showing deficient performance as required by *Strickland.*

## XII.

Appellant next claims that the trial court erred in denying his motion to dismiss Count III, the Count seeking the death penalty. The basis of the motion was that the present method of execution in Indiana, namely death by electrocution, is cruel and unusual punishment forbidden by the eighth amendment due to its physical effect on the person.

In support, of this contention appellant presented periodical reports of the trauma suffered in the course of electrocution. The risk that electrocution will not cause instantaneous and painless death has been well known as courts have considered whether it falls within the prohibition of the constitution. *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947). Such case was preceded by *In re Kemmler,* 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890), which had upheld this method of carrying out a sentence of capital punishment in the State of New York. See also Opinion of Stewart, Powell, and Stevens, JJ. in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). This Court has likewise been unable to reach the conclusion that this method of execution involves the unnecessary and wanton infliction of pain. *Fleenor v. State* (1987), Ind., 514 N.E.2d 80. The showing here commands the same result.

## XIII.

We finally consider whether the death penalty is appropriately applied in this instance. Review by this Court of every death sentence is automatic and mandatory. Review is more intensive and sentence review rules are applied only as guidelines. *Cooper,* 540 N.E.2d 1216. Adherence to the procedures set forth in the death sentence statute is basic and essential.

The trial court correctly followed the procedures set forth in the death sentence statute. The trial court considered the presentence report and the jury recommendation. The court then found appellant guilty of the crimes alleged in Counts I and II, namely murder and arson. The court also expressly found, as trier of fact, and beyond a reasonable doubt, that appellant did intentionally kill the victim while committing arson and burglary, the sole aggravating circumstance alleged in Count III. The court then assessed the evidence as to whether it supported the statute's mitigating circumstances, and finding that it supported none, concluded that the weight of the lone aggravator predominated and that the sentence of death was proper.

Here, the jury recommended the death sentence. Appellant was twenty years old at the time of this crime. He is a lifelong resident of Anderson, Indiana. As a juvenile under court protection he received eight months of counseling at a Center for Mental Health. He spent twelve months in Crossroads Children's Home in Fort Wayne. He graduated from high school while in the Indiana Boy's School. He served nine months in the National Guard and two months in the Army before being discharged because he had not revealed the full nature of his juvenile record. He became addicted to alcohol at age twelve and had been arrested six times as an adult for illegal consumption, and an attempted burglary charge pended at the time of this offense. During the three month period preceding this killing he set a house and three garages on fire. During this period he worked at a car wash and restaurant but was out of work when the killing oc-

curred. While at Crossroads he met Mark Wisehart, his best friend. He reported voluntarily to the police that Wisehart had killed one Marjorie Johnson, and appellant testified at Wisehart's trial for this killing. Wisehart was convicted and received the death penalty. Appellant was remorseful about having done this.

Ten witnesses testified before the jury on behalf of the appellant at the penalty phase trial. Appellant also testified. Family and friends verified his alcohol abuse and incorrigibility. Former officials verified that he got along in confinement.

Appellant's crime, character and background resembles that considered by this Court in *Woods v. State* (1989), Ind., 547 N.E.2d 772. Woods was nineteen, appellant twenty. Both had juvenile records and both had been moved to institutions during childhood. Woods suffered a borderline mental disorder, while appellant abused drugs and alcohol. Woods armed himself with a knife, and in conjunction with others he knocked on the door of an elderly neighbor to rob him, then stabbed the neighbor, killing him, and stealing his property. Appellant did not arm himself with a weapon during the planning stage, but did so on the porch, entered the house, and beat and stomped the elderly neighbor to death, stealing her property, and burning the house. The weight of the aggravator in the two cases is approximately the same.

As determined above in Section III of this opinion, the trial judge committed error in failing the give some mitigating value to the effects of appellant's long history of alcohol addiction and its throes on the night of this crime. We have done so, and find it to have less value than the mitigators in *Woods*. Present in *Woods*, and absent here, was the mitigator for turbulent childhood marked by mistreatment and the mitigator for lack of an adult criminal history. We conclude however that appellant can fare no better than did Woods. When the mitigating circumstance here, namely substantial impairment of the faculty for appreciating criminality, is properly and accurately determined and evaluated, it is outweighed by the lone aggravating cir-

cumstance here, namely the intentional beating and stomping of Ruby Hutslar in the course of committing a burglary at her house and burning that house. The sentence is not aribitrary or capricious, and is not manifestly unreasonable. It is properly meted out in this case.

The convictions for murder and arson are affirmed as is the imposition of death.

SHEPARD, C.J., DICKSON and KRAHULIK, JJ., concur.

GIVAN, J., not participating.