Gregory Scott JOHNSON, Appellant (Defendant below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 48S00–9305–PD–00498.

Supreme Court of Indiana.

March 9, 1998.

Rehearing Denied June 26, 1998.

Linda M. Wagoner, Indianapolis, Michelle Fennessy, Fort Wayne, for Appellant.

Pamela Carter, Attorney General, Geoff Davis, Deputy Attorney General Indianapolis, for Appellee.

SULLIVAN, Justice.

We affirm the denial of Gregory Scott Johnson's petition for post-conviction relief.

## Background

Petitioner Gregory Scott Johnson appeals the denial of post-conviction relief with respect to his convictions for Murder,[1] Arson,[2] and sentence of death.[3] We unanimously affirmed Johnson's direct appeal of these convictions and sentence in an opinion authored by Justice DeBruler. *Johnson v. State*, 584 N.E.2d 1092 (Ind.1992).

The murder conviction was on a charge that Johnson had killed an elderly woman by striking her with a blunt instrument and kicking and hitting her during the commission of a burglary of her home. The Arson conviction was on a charge that Johnson had knowingly damaged the victim's home by means of a fire. The death sentence was supported by the aggravating circumstance that the killing had been done intentionally while committing the crimes of Burglary and Arson.[4]

Prior to trial, Johnson sought to compel discovery of all written reports by police officers and firefighters concerning their investigations of the crimes at issue. The trial court denied Johnson's request. We affirmed the propriety of this ruling on direct appeal. *Id.* at 1103. Following trial, the trial court ordered the reports of nineteen officers sealed and transmitted to us for review. Appellate counsel also had access to the reports. We concluded that there was no reasonable probability that the material withheld by the prosecutor was such that the proceedings at the guilt stage, the jury recommendation stage, or the judge sentencing stage would have been resolved differently. *Id.* at 1104.

Our earlier opinion contains additional details about the crimes of which and the proceedings in which Johnson was convicted.

## Discussion

■ At the trial on his petition for post-conviction relief, Johnson had the burden of establishing his grounds for relief. Ind. Post-Conviction Rule 1(5). Therefore, he is now appealing from a negative judgment. When an appeal is from a negative judgment, we must be convinced that the evidence as a whole was such that it leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind. 1995); *Williams v. State*, 508 N.E.2d 1264, 1265 (Ind.1987); *Lowe v. State*, 455 N.E.2d 1126, 1128 (Ind.1983). It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that the decision will be disturbed as being contrary to law. *Spranger*, 650 N.E.2d at 1120 (quoting *Fleenor v. State*, 622 N.E.2d 140, 142 (Ind.1993), *cert. denied* 513 U.S. 999, 115 S.Ct. 507, 130 L.Ed.2d 415 (1994)).

### I

Johnson contends that he is entitled to post-conviction relief because the prosecutor

---

1. Ind.Code § 35-42-1-1 (1982). Unless otherwise indicated, references to Ind.Code § 35-42-1-1 refer to the version published in the 1982 Edition of the Indiana Code, the murder statute in effect at the time the crimes at issue were committed.

2. Ind.Code § 35-43-1-1 (1982). Unless otherwise indicated, references to Ind.Code § 35-43-1-1 refer to the version published in the 1982 Edition of the Indiana Code, the arson statute in effect at the time the crimes at issue were committed.

3. Ind.Code § 35-50-2-9 (Supp.1983). Unless otherwise indicated, references to Ind.Code § 35-50-2-9 refer to the version published in the 1983 Supplement to the Indiana Code, the death penalty statute in effect at the time the crimes at issue were committed.

4. Ind.Code § 35-50-2-9(b)(1).

committed misconduct by withholding material exculpatory evidence.

As discussed briefly *supra*, the trial court denied Johnson's request for the production of all police and fire department reports. Subsequent to the trial, the trial court ordered the reports of nineteen officers to be sealed and sent to us for review in Johnson's direct appeal. *Johnson*, 584 N.E.2d at 1104. Johnson's current claim is that information relating to four matters was not forwarded to us on direct appeal and that because the information which was withheld contained material exculpatory evidence, post-conviction relief is warranted.

■ The prosecution has an affirmative duty to disclose evidence favorable to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995) (citing *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196–97. The Supreme Court later determined that the failure to request favorable evidence did not relieve the State of its obligation to disclose evidence favorable to the defendant. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976). More recently, in *United States v. Bagley*, the Court applied a materiality standard for favorable evidence and held that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

473 U.S. 667, 682, 105 S.Ct. 3375, 3383–3384, 87 L.Ed.2d 481 (1985).

■ An allegation of a *Brady* violation requires a demonstration that the undisclosed favorable evidence "could be reasonably taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. at 1566.[5] A new trial is warranted if there is a reasonable probability that disclosure of the evidence would have produced a different result. *Id.* at 419, 115 S.Ct. at 1558. We do not find there to have been a *Brady* violation.

### A

■ Johnson first claims that the prosecutor did not disclose information demonstrating that the police also considered one Paul Decker as a suspect, *to wit:* (1) the existence of an order permitting the taking of Decker's pubic hairs, (2) the results of the laboratory examination of the pubic hairs, and (3) the discovery of latent prints not matching Johnson or the victim. We treat Johnson's claim as arising under the State's duty to disclose matters known to the prosecutor to be "obviously exculpatory." *See Agurs*, 427 U.S. at 107, 96 S.Ct. at 2399. *See also Dukes v. State*, 501 N.E.2d 420, 423 (Ind.1986); *Schultz v. State*, 497 N.E.2d 531, 534–35 (Ind. 1986). In order to succeed on a claim that he was denied access to exculpatory evidence, Johnson must first demonstrate that exculpatory evidence existed. *Williams v. State*, 455 N.E.2d 299, 307 (Ind.1983) (citing *White v. State*, 263 Ind. 302, 304, 330 N.E.2d 84, 85 (1975)). Johnson has failed in this regard.

---

5. Johnson contends that this case is remarkably similar to *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and for this reason, his death sentence should be vacated. We disagree. In remanding Kyles's case for retrial, the Supreme Court stated the following:

> But confidence that the verdict would have been unaffected cannot survive when suppressed evidence would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was sub-

> ject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid.

*Kyles*, 514 U.S. at 454, 115 S.Ct. at 1575.
The facts of this case are significantly different than *Kyles*. In *Kyles*, the defendant denied participating in the shooting and the evidence withheld had a reasonable tendency to support the defense. Unlike *Kyles*, Johnson does not argue that the undisclosed evidence in this case indicates that he was not involved, but rather that he had an accomplice.

### A-1

Before addressing why Johnson has not carried his burden of proving the challenged information to be exculpatory, we make some general observations. The thrust of Johnson's claim is that the undisclosed information indicates that Decker was a suspect in the crime and that this fact alone is exculpatory. It is important to understand that Johnson does not maintain that he was not involved in the crimes at issue. Johnson only contends that Decker accompanied him in the commission of the crimes.[6] Johnson cannot make out a *Brady* violation on this basis alone.

"[R]egardless of whether the evidence was material or even exculpatory, when information is fully available to a defendant at the time of trial and his only reason for not obtaining and presenting the evidence to the Court is his lack of reasonable diligence, the defendant has no *Brady* violation." *United States v. White*, 970 F.2d 328, 337 (7th Cir.1992) (quoting *United States v. Brown*, 628 F.2d 471, 473 (5th Cir.1980)). The information which Johnson claims to be exculpatory—Decker's involvement in the crimes—was information (if true) that Johnson had available to him at the time of trial. If Decker was in fact present during the commission of the crimes, Johnson was aware of this fact and did not need the State to advise of him of its suspicions regarding Decker's participation. *Cf. White*, 970 F.2d at 337 (" 'While the Supreme Court in *Brady* held that the [g]overnment may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the [g]overnment to conduct a defendant's investigation or assist in the presentation of the defendant's case.' *United States v. Marrero*, 904 F.2d 251, 261 (5th Cir.1990).").

### A-2

In addressing the specific information which Johnson challenges, we review the post-conviction court's findings that the additional information discovered by Johnson not submitted to us for review on direct appeal does not constitute exculpatory evidence.

Johnson's first claim is that the State should have disclosed the existence of an order for the taking of Decker's pubic hairs. Johnson argues that the State, in obtaining the order, must have established with probable cause that Decker was a suspect and that this fact is "unquestionably exculpatory to Johnson."[7] Br. of Appellant at 25. As stated *supra*, the mere fact that the police suspect (or have probable cause to suspect) the involvement of another in addition to the defendant is not exculpatory where the defendant acknowledges the defendant's own participation in the crime.

Johnson next contends that the prosecutor engaged in misconduct by failing to inform Johnson of the results of a laboratory analysis comparing a hair found on the gloves, which were suspected of being used in the crimes, to Decker's pubic hair. The laboratory report revealed that the hair found on the gloves was "microscopically dissimilar" to Decker's pubic hair and that the hair could not have originated from Decker. On this basis, the post-conviction court found that the results of the test were not exculpa-

---

6. Johnson's contention that Decker was his accomplice in the crimes arose for the first time after his conviction and sentences were affirmed. Before trial, Johnson did not tell the police, his lawyer, or anyone else that Decker was with him. When the police attempted to question Decker following Johnson's arrest, Johnson insisted that Decker had "nothing to do with this" and "knew nothing about this case." (T.R. at 2896.) Defense counsel deposed Decker (and his girlfriend). No witnesses ever placed Decker in the victim's home at the time of the crimes. (We refer to the record in this post-conviction hearing as "R" and the record of Johnson's trial as "T.R.")

7. The order cannot be located. The post-conviction court declined to speculate on how the order was obtained, but concluded that there was no probable cause to believe that Decker was present when Johnson murdered the victim. We agree with Johnson that the standard for granting an order of this nature is a showing of "probable cause." *See* Ind.Code § 35-33-5-2(b) (Supp.1984); *Houser v. State*, 678 N.E.2d 95, 99 (Ind.1997); *Utley v. State*, 589 N.E.2d 232, 236 (Ind.1992); *Nettles v. State*, 565 N.E.2d 1064, 1067 (Ind.1991). However, for the reasons set forth in the text, this does not equate to the order constituting exculpatory evidence.

tory.[8] Our review of the record does not lead us to an opposite conclusion. *See Averhart v. State*, 614 N.E.2d 924, 928 (Ind.1993) (where we stated that inconclusive tests cannot be said to be exculpatory).

 Finally, Johnson contends that it was misconduct not to inform him that identifiable latent prints found at the victim's home did not match the prints of either Johnson or the victim. Johnson's argument seems to be that the fact that these prints were compared (inconclusively) to Decker's finger prints proves that Decker was a suspect. As. we stated *supra,* proof that Decker may have been a suspect is not exculpatory evidence.

### B

 Johnson contends that it was misconduct for the prosecutor to fail to disclose police reports containing statements made by one Cathy Mundy. Mundy was Decker's ex-girlfriend and provided several statements to the police prior to trial pertaining to Decker's and Johnson's whereabouts around the time of the crimes. Mundy testified during the post-conviction hearing. There were some inconsistencies between the pre-trial police reports containing her statements and her testimony during the post-conviction hearing. The post-conviction court found that the pre-trial police reports that Johnson contends should have been disclosed indicated a possibility that Decker's alibi was slightly less firm than would have been inferred

from the information available to Johnson at trial. However, the post-conviction court found that the information would not have changed the theory of defense since Johnson never told his attorney that anyone else was present. Our review of the record indicates that the evidence supports this finding.

The post-conviction court also concluded that this information was not exculpatory. Our review of the record and the post-conviction court's findings do not lead us to an opposite result. Johnson argues that two police reports should have been disclosed— one filed by Detective Brown and the other by Officer Reed. Brown's report was submitted to us for review on direct appeal wherein we determined that none of the police reports contained exculpatory evidence.[9] Consequently, Johnson's challenge to Brown's report is not available for re-litigation here. *See Baird v. State*, 688 N.E.2d 911, 914 (Ind.1997); *Harris v. State*, 643 N.E.2d 309, 310 (Ind.1994); *Lowery v. State*, 640 N.E.2d 1031, 1045 (Ind.1994); *Smith v. State*, 613 N.E.2d 412, 413 (Ind.1993); *Grey v. State*, 553 N.E.2d 1196, 1199–1200 (Ind. 1990). As to Reed's report, Johnson does not cite to the record to advise us where this report is located nor does Johnson state specifically what is contained in this report which is favorable to Johnson. The only report filed by Reed that we have been able to locate in the record is Mundy's pre-trial signed statement which Johnson concedes he received at trial.[10] Br. of Appellant at 27.

8. The post-conviction court noted that the State should have turned over the information concerning the taking of Decker's pubic hairs, but that the failure to do so was harmless since the evidence was not exculpatory.

9. After interviewing Mundy four days after the crimes, Detective Brown made the following statements in a report he filed (emphasis added):

I asked her fist [sic] about [Decker's] whereabouts on Saturday night and Sunday in the early morning hours. She stated that without any question in her mind that [Decker] was not involved and that he was with her almost the entire weekend.... I asked her when the last time she saw [defendant] was. She said first it was Friday night, then changed it to Thursday night of last week. This would be 6–20–85, ... I asked her if [Decker] [on Saturday, 6/22/85] could have gotten up and [she] said no.... She said that [Decker] slept with his arms around her and that if [omitted words] up and

left, she would have known.... She stated that she would not lie on something like this. (R. at 2878–81)

Detective Brown also made the following statements in the report: Mundy appeared to be relaxed and calm and "I have nothing at this time to prove she is lieing [sic] and I have no gut feeling that she is. However, *I believe that if there is a break up between the two, she would come forward."* (R. at 2880–81.)

10. Following are some of the relevant statements that Mundy made in her pre-trial signed statement (emphasis added):

Scott Johnson was arrested for this murder, but *I believe that Paul Decker may have also been involved....* On the day before the old lady was killed [Decker] had left the ap[art]ment] around 4 pm and returned home around 10 pm. I don't know where he was, but I assume he was with Scott Johnson since that's

Johnson contends that because the Brown report was never disclosed to him at trial,[11] he was not able to discover the differences between Brown's report and Mundy's signed statement to Reed.[12] While this is true, it is also clear that the signed statement Johnson did possess (the Reed report) was more favorable to Johnson than the Brown report. As such, to the extent the Mundy materials are "exculpatory" at all, the material Johnson had available prior to trial (the Reed report) on precisely the same issue was inconsistent with, and was more exculpatory than that which was withheld (the Brown report).

During the post-conviction hearing, Mundy testified that she remembered telling the police about waking up on the morning of the incident and finding Decker fully dressed and with a black flashlight laying beside the bed. However, the police reports do not reflect these statements.[13] Mundy also testified that she did not know what happened to that flashlight. (Decker's alleged possession of a black flashlight is at least arguably significant because the evidence indicates that the victim owned two black flashlights, but only one was found in the house after the crimes.) On cross-examination during the post-conviction hearing, the prosecutor elicited testimony illustrating that several statements made by Mundy were inconsistent with statements she had previously made to the police.[14] Furthermore, the prosecutor elicited testimony indicating that Mundy's statements about Decker's involvement in the crime occurred only after the relationship

---

who he usually was with. We went to bed together that night and [Decker] was wearing a pair of blue jean shorts at the time. When I woke up the next morning I found [Decker] in bed beside me with all his clothes on including his shoes. This was the morning that the old lady had been killed. Later that day after Scott Johnson had been arrested, [Decker] had gone to the store and bought a twelve pack of beer and a few grocerys. [sic] I found that suspicious because [Decker] never worked and rarely had any money. After that day [Decker] kept coming up with more and more money and I kept getting more suspicious until finally after few day I went to him and asked if he had gotten the money from the old lady that had been killed. When I asked him this, [Decker] just looked at me and smile, but did not answer me. . . . On the day before the murder my mother had watched my little girl for me. The next morning she had brought my daughter home and when she got there she had found our apartment door standing wide open then looked inside and seen [Decker] laying in bed with me fully clothed. [sic] (R. at 351.)

11. As stated earlier, the trial court denied Johnson's discovery request for all police reports.

12. Compare note 10, Mundy's signed statement given after the relationship ended, with note 9, a statement given to Detective Brown while Mundy and Decker were still dating.

13. Johnson elicited testimony from Mundy suggesting that she cannot read very well (R. at 344) and that before she signed any papers, the police explained to her the contents of the papers. Although not explicitly stated, Johnson appears to suggest that it is possible that Mundy did inform the police about the black flashlight, but that she signed the papers without reference to such facts because she could not read. Without more evi-

dence, we can only conclude that the police were thorough and accurate in preparing the report. *See Kennedy v. State*, 578 N.E.2d 633, 639 (Ind. 1991) (citing *United States v. Lott*, 854 F.2d 244 (7th Cir.1988); *United States v. Aviles*, 623 F.2d 1192 (7th Cir.1980)) ("presumption that public officers discharge their duties with due care"); *Davis v. Howard*, 73 N.E.2d 344, 345 (Ind.1947) ("We are bound to presume that public officers do their duty until the contrary is made to appear.") (citations omitted). Additionally, Reed testified during the post-conviction hearing that it was his practice to have a witness read a few sentences of their statement out loud in order to confirm that the witness could read. Reed testified that if Mundy was unable to read he would have included that in the statement and had a witness attesting to the fact that the statement was read to Mundy.

14. The prosecutor elicited the following testimony during the post-conviction hearing from Mundy on cross-examination:

Q: Did you tell [Detective] Brown that there wasn't any question in your mind that [Decker] was not involved in the murder and that he was with you almost the entire weekend?

A: I don't remember telling him the whole entire weekend, but I might have said that.

Q: There wasn't any doubt in your mind that he wasn't involved in the murder? Did you tell me that?

A: I might have said that. I'm not really sure.

Q: You also told [Detective] Brown that when [Decker] slept, he slept with his arms around you, and that he would have woken you up had he gotten up at night?

A: Well, I've never took them kind of pills before, so I don't know if I would have.

Q: You didn't say that to [Detective] Brown on June 27th, though, did you?

A: I don't remember.

between the two of them ended. We find nothing here that points us in the opposite direction from the post-conviction court's conclusion that the State did not withhold exculpatory information. At issue here was a credibility contest between, on the one hand, Mundy's testimony at the post-conviction hearing and, on the other hand, the accuracy of the Brown report and Reed's record of Mundy's pre-trial statement. As set forth *supra*, particularly in notes 13 and 14, there was evidence from which the post-conviction court could conclude that Mundy's post-conviction testimony in this regard was not credible.

### C

■■■ Johnson contends that the prosecutor committed misconduct by not disclosing certain letters received by the police which were allegedly written by Johnson and sent to one Kim Harris Rohrbacher.[15] Rohrbacher was a high school friend of Johnson's. Johnson claims that while the contents of the letters were and are unknown, they should have been disclosed because they were relevant for mitigation purposes (apparently because they would show Johnson in a humane light).[16] We find this claim too attenuated to support post-conviction relief. Logic does not support simultaneous contentions that Johnson wrote such letters but he did not know they existed; or that they contained mitigating evidence but he did not know their contents. Even after the post-conviction hearings, Johnson is not able to point us to anything exculpatory about such letters.

### D

Johnson contends that it was improper for the prosecutor not to disclose evidence concerning police dog tracking following the crimes. This claim was reviewed and reject-

ed on direct appeal, *Johnson*, 584 N.E.2d at 1104, and is not available for re-litigation here. *See Baird*, 688 N.E.2d at 914; *Harris*, 643 N.E.2d at 310; *Lowery*, 640 N.E.2d at 1045; *Smith*, 613 N.E.2d at 413; *Grey*, 553 N.E.2d at 1199–1200.

### II

Johnson presented the post-conviction court with a list of alleged errors committed by his lawyer on direct appeal the effect of which he claims deprived him of his constitutional right to the effective assistance of counsel. U.S. Const. amend. VI; Ind. Const. art. I, § 13. This constitutional right, which requires the effective assistance of both trial and appellate counsel, has been firmly recognized by the United States Supreme Court and this Court. *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984); *King v. State*, 467 N.E.2d 726, 728–29 (Ind.1984). The post-conviction court concluded that Johnson was not denied the effective assistance of appellate counsel to which he was entitled.

■■■ A sentence of death may not be imposed unless the sentencer finds that the properly charged and proven statutory aggravating circumstances with respect to the murder outweigh any mitigating circumstances with respect to the offender and the crime. Ind.Code § 35–50–2–9(e). As such, defense counsel in a capital case has a particular duty to investigate possible mitigating circumstances and present evidence of mitigation to the jury. *Burris v. State*, 558 N.E.2d 1067, 1074 (Ind.1990). Johnson claims trial counsel failed to investigate adequately mitigation evidence and failed to present such evidence to the jury.[17]

■■■ We analyze claims of ineffective assistance of appellate counsel similar to

(R. at 357–59).

15. In his brief, Johnson states that police reports indicate that copies of letters from Johnson to Rohrbacher were received by the police. We have reviewed the reports Johnson cites and find no reference to any such letters. On the other hand, during the post-conviction hearing, Rohrbacher did testify that she gave the police two letters sent to her by Johnson. However, Rohrbacher was never questioned as to the contents of such letters and they have not been located either by the prosecutor or by the police.

16. Johnson contends that because the State did not use the letters during trial, the letters must have contained some evidence favorable to Johnson. One could just as easily say that because Johnson did not question Rohrbacher at the post-conviction hearing about the contents of the letters, the letters must have contained some evidence unfavorable to Johnson.

17. Johnson also claims that appellate counsel was ineffective for the following reasons: (1) failing to discern the existence of exculpatory evidence contained in the sealed police reports

claims of ineffective assistance of trial counsel. Claims of ineffective assistance of counsel are analyzed according to the two-part test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Lowery,* 640 N.E.2d at 1041. First, we require the defendant or petitioner to show that, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. *Id.* (citing *Turner v. State,* 580 N.E.2d 665, 668 (Ind.1991)). Second, we require the defendant or petitioner to show adverse prejudice as a result of the deficient performance. This showing is made by demonstrating that counsel's performance was so prejudicial that it deprived the defendant or petitioner of a fair trial. *Games v. State,* 690 N.E.2d 211, 213–14; *Lowery,* 640 N.E.2d at 1041. We will conclude that a fair trial has been denied when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unreliable. *Lowery,* 640 N.E.2d at 1041 (citing *Best v. State,* 566 N.E.2d 1027 (Ind.1991)). *See also Sanchez v. State,* 675 N.E.2d 306, 310 (Ind.1996). Because Johnson is claiming that appellate counsel was ineffective for failing to claim on direct appeal the ineffective assistance of trial counsel with respect to certain issues, Johnson must establish both deficient performance and resulting prejudice on the part of both trial and appellate counsel. The failure to establish either prong with respect to either trial or appellate counsel will cause the entire claim to fail. *Roche v. State,* 690 N.E.2d 1115, 1120–21 (Ind.1997).

 Johnson alleges that the jury and trial court were not presented mitigating evidence regarding parental neglect, abnormal childhood behavior or serious psychological trauma preceding the incident.[18] The post-conviction court found that "[t]here exists no other substantial evidence of mitigation

submitted to the Supreme Court; (2) failing to perform an independent investigation of the scaled material submitted to the Supreme Court; and (3) raising a claim of ineffective assistance of trial counsel without conducting an independent investigation of the facts or of trial counsel's performance. Because we determined on direct appeal that the evidence submitted to us was not exculpatory, we do not find counsel ineffective for failing to discover exculpatory evidence. In fact, we determine this claim to be nothing more than an attempt to re-litigate the issue of the existence of exculpatory evidence under the guise of a new claim. This issue is not available for re-litigation. *See Yerden v. State,* 682 N.E.2d 1283, 1286 (Ind.1997); *Scott v. Scott,* 668 N.E.2d 691, 699 (Ind.Ct.App.1996) ("the principle of res judicata prevents the repetitious litigation of that which is essentially the same dispute."). *Cf. Schiro v. State,* 533 N.E.2d 1201, 1205 (Ind. 1989); *Lane v. State,* 521 N.E.2d 947, 949 (Ind. 1988) (both of which hold that petitioner's allegation of ineffective assistance of counsel is an attempt to circumvent post-conviction rules in order to present issues which have been waived). As to the claim of appellate counsel being ineffective for raising the issue of ineffective assistance of counsel on direct appeal, the post-conviction court found any possible error to be harmless since the issue of ineffective assistance of trial counsel was fully litigated in the post-conviction hearing. We agree with the post-conviction court's findings.

18. In his brief, Johnson asserts the failure of trial counsel to discover Johnson's (1) behavior trouble in school, (2) psychological impact as a result of testifying against his friend (Mark Allen Wisehart, who is currently on death row), (3) disappointments from his lack of paternal attention, (4) violent relationship with a man whom he thought to be his step-father (whom he now knows is his biological father); and (5) self-mutilation tendencies or early childhood abuse. Johnson has not provided us with citations to the post-conviction record substantiating the existence of such evidence. *See* Ind. Appellate Rule 8.3(A)(7) (appellant shall cite to parts of the record relied upon); *Flinn v. State,* 563 N.E.2d 536, 543 (Ind.1990) ("failure to cite to locations in the record where evidentiary errors occurred at trial results in waiver"); *Callahan v. State,* 527 N.E.2d 1133, 1141 (Ind.1988) ("It is the responsibility of the defendant to support his contentions with appropriate citations to the record as well as legal authorities."); *Howard v. State,* 481 N.E.2d 1315, 1318 (Ind.1985) (failure to cite to the relevant portions of the record generally results in a waiver of the alleged error). We nevertheless reviewed the post-conviction record and gleaned the following evidence in support of these assertions. First, Johnson's mother testified that she had to go to school on two occasions because Johnson was "rowdy." Second, Johnson provides no evidence of the psychological impact upon Johnson in testifying against his friend, Mark Allen Wisehart, except to say that trial counsel never questioned anyone regarding the relationship between the two friends and the impact of the testimony. Third, Johnson's sister testified during post-conviction hearing about

which could have been presented in this case to obtain a different result." (R. at 203–04.) Based upon our review of the record (see note 18), we conclude there was evidence to support the findings of the post-conviction court and so do not find counsel's performance to be deficient. On direct appeal, our review of the record indicated that ten (10) witnesses had testified on behalf of Johnson during the penalty phase of the trial.[19] *Johnson*, 584 N.E.2d at 1108. Through these witnesses, counsel presented as a reasonable basis for imposing a sentence other than death (both to the jury during the penalty phase and to the court at sentencing) aspects of Johnson's background, character and record and the circumstances of these crimes. *See Williams v. State*, 669 N.E.2d 1372, 1384 (Ind.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1828, 137 L.Ed.2d 1034 (1997). While more mitigation evidence (but not much more—see note 18) was uncovered at the post-conviction hearing, counsel's performance at trial cannot be deemed deficient.

### III

■ Johnson contends that he was denied the effective assistance of appellate counsel because of counsel's failure to raise on direct appeal trial counsel's ineffectiveness due to systemic errors in the operation of the Madison County public defender's office. The sole basis for Johnson's claim appears to be that because both trial counsel were under-compensated (*i.e.*, not compensated until trial had already begun), trial counsel were prevented from rendering effective assistance. The evidence which Johnson presents to support this claim is the testimony of one of his attorneys during the post-conviction hearing. The attorney stated that they were underpaid and that if they had been adequately compensated they "could have spent more time looking for additional items or issues to raise which were not apparent from the surface...." (R. at 551.)

■ While this court has recognized the importance of adequate compensation for counsel and investigation support in capital cases, *see* Ind.Crim.Rule 24(C) (as amended effective Feb. 1, 1993), the fact that attorneys believe they could have done more had they been more highly compensated does not com-

---

some abuse which Johnson suffered at the hands of Frank Newman (now known to be Johnson's biological father) and Johnson's grandfather. Johnson also contends it was ineffective for counsel to have failed to discover Johnson's epilepsy and present it as a mitigating circumstance. Johnson contends that medical records would have disclosed Johnson's epilepsy, but does not cite to the record directing us to these medical records. Our review of the record indicates that the only reference to Johnson's epilepsy was testimony from his mother during the post-conviction hearing that she learned about Johnson's epilepsy only after he was incarcerated.

19. Captain Maxey, who is in charge of jail administration, said that it would be fair to describe Johnson as a "peacemaker." (T.R. at 3000.)

Mary Bradshaw, a therapist at Cross Road Children's Home, testified that Johnson did "okay" within a structured environment. (T.R. at 3015.)

Dan Mundy testified that on the night prior to the incident, Johnson was intoxicated. (T.R. at 3017.)

Debra Otis, Johnson's sister, testified about Johnson's drinking problems. (T.R. at 3024.)

Linda Byrne, Johnson's former girlfriend, testified that Johnson had a drinking problem, (T.R.

3028), and that he was very intoxicated the night prior to the incident. (T.R. at 3034.)

Alice Newman, Johnson's mother, testified about Johnson's drinking problem, (T.R. at 3046–47), and about his behavior problems and ending up at Cross Roads. (T.R. at 3047.)

Johnson testified about his drinking problem, (T.R. at 3052), and as to how much he drank the night before the incident. He also stated that he remembered very little about the night before the incident and that based on what he heard at trial that he was convinced that he did it. (T.R. at 3123.) He also displayed remorse by stating that he prayed for the victim's family. (T.R. at 3124.)

Dr. Maickel testified as to the effect alcohol and other drugs have on behavior, (T.R. at 3085–92), and about the state of mind of a person who drank the quantity of alcohol that Johnson contends he drank. (T.R. at 3095–97.)

Rick Long, manager of Addictions Unit at the Center for Mental Health, testified that Johnson had a great deal of conduct problems, had defiance to authority, but was emotionally insecure. (T.R. at 3113.) He also stated that Johnson seemed to do quite well in the institutional structure.

Detective Hay testified as to the information Johnson provided in another murder case. (T.R. at 3119.)

pel a conclusion that their performance was deficient. Irrespective of whether there were problems with the public defender system, in order to claim ineffective assistance of counsel, Johnson must show that his trial counsel provided deficient performance and that it was prejudicial. *See Platt v. State,* 664 N.E.2d 357, 362–63 (Ind.Ct.App.1996) (where defendant unsuccessfully argued that public defender lacked sufficient funds to permit performance of adequate pretrial investigation and preparation by appointed counsel), *trans. denied, cert. denied* — U.S. ——, 117 S.Ct. 1470, 137 L.Ed.2d 683 (1997). *See also Sublett v. State,* 665 N.E.2d 621, 623 (Ind.Ct.App.1996) ("there is no constitutional violation unless the defendant can prove he was prejudiced at trial by the deficient performance"), *trans. denied.* Johnson makes no such showing here. *See e.g., Games v. State,* 684 N.E.2d 466, 481 (Ind.1997) ("the defendant does not assert and establish that individualized errors due to systemic problems undermined the reliability of his convictions"), *modified on reh'g,* 690 N.E.2d 211.

### IV

██ William Lawler served as Madison County prosecutor at the time of Johnson's trial. Johnson apparently filed a motion to disqualify Lawler from participation in the post-conviction proceeding.[20] Apparently between the time of the filing of the motion and the start of the post-conviction hearing, Lawler ran for re-election and was defeated. At this point, the post-conviction court apparently dismissed the motion as moot. During

the post-conviction hearing, Johnson renewed the motion, seeking disqualification of the entire Madison County prosecutor's office.[21] The trial court again found the issue moot, concluding that any conflict Lawler might have had could not be attributed to the successor prosecutor or his office. This decision was correct.

Johnson relies on *State ex rel. Goldsmith v. Superior Court of Hancock County,* 270 Ind. 487, 386 N.E.2d 942 (1979), where we held that "if the elected prosecutor himself becomes a witness in a case or otherwise is disqualified by reason of having an interest in the outcome, his entire staff of deputies must be recused in order to maintain the integrity of the process of criminal justice." *Id.,* 270 Ind. at 491, 386 N.E.2d at 945. However, the principal holding in *State ex rel. Goldsmith* was that the disqualification of an individual deputy prosecutor did not mandate the disqualification of the prosecutor or the rest of the prosecutor's office (or, in that case, a successor prosecutor and the successor prosecutor's office). *State ex rel. Goldsmith* cannot be fairly read to hold that the facts which would disqualify a prosecutor from participating in a particular case disqualify a successor prosecutor as well.[22]

### V

██ Johnson claims that he is entitled to post-conviction relief because of erroneous findings of facts by the post-conviction court. We reject this contention. First, while Johnson lists a number of findings of fact which he contends are erroneous,[23] he does not cite

---

**20.** Our review of this issue is hampered by Johnson's failure to include in the record a copy of the pre-trial motion and its denial in the record.

**21.** It is not entirely clear from the record but it appears that the renewed motion was in part motivated by the fact that the newly elected prosecutor had been a patrolman in the local police department at the time of the crimes. There seems to be no dispute but that the newly elected prosecutor had not been involved in the investigation in any way. The post-conviction court held that there was no basis for disqualifying the new prosecutor and we find no basis to disagree.

**22.** This issue suggests the question of whether the special prosecutor appointment statute, Ind. Code § 33–14–1–6 (Supp.1984), may be invoked in post-conviction proceedings. We are inclined to think that that statute is available only with respect to the prosecution of criminal charges, not the *defense* of what is essentially a civil proceeding, but leave definitive resolution of that question to a case where it is clearly presented.

**23.** The following table sets forth certain of the post-conviction court's findings of fact which Johnson claims are erroneous:

| Post–Conviction Court's Finding of Fact | Johnson's Contention |
| --- | --- |
| Victim was born in 1900. | Victim was born in 1902. |
| Frank Newman is Johnson's step-father. | Newman is Johnson's biological father. |

anything of record to demonstrate that they are wrong. Failure to supply this court with citation to authority and citation to the relevant portions of the record generally constitute a waiver of the alleged error. Ind.Appellate Rule 8.3(A)(7). *See Flinn v. State,* 563 N.E.2d 536, 543 (Ind.1990); *Callahan v. State,* 527 N.E.2d 1133, 1141 (Ind.1988); *St. John v. State,* 523 N.E.2d 1353, 1355 (Ind. 1988); *Howard v. State,* 481 N.E.2d 1315, 1318 (Ind.1985). Second, and more to the point, Johnson has only advised us that particular findings were erroneous, but does not provide us with argument or analysis as to how he has been prejudiced by these findings, *i.e.,* how the findings he asserts are correct would have entitled him to post-conviction relief.

### Conclusion

We affirm the denial of Gregory Scott Johnson's petition for post-conviction relief.

SHEPARD, C.J., and DICKSON, SELBY and BOEHM, JJ., concur.

| | |
|---|---|
| Johnson's testimony was not instrumental in Mark Allen Wischart's death sentence recommendation. | Such testimony was instrumental. |
| After Wischart was released from juvenile detention, he murdered an elderly woman. There is no evidence that Johnson feels anything for Wischart's victim. | These findings were irrelevant to this case. |
| Johnson stepped on the victim several times. | Johnson stepped on the victim only once. |
| The victim was "bludgeoned to death." | The victim's death resulted from blunt force trauma. |
| Johnson returned to the victim's house to watch the fire | Johnson was found down the street from the fire standing with another person. |
| The figures used to calculate Johnson's blood alcohol level were based upon Johnson's statement. | Johnson's alcohol consumption was well-documented by several persons. |
| Additional information not available to defense counsel at trial "would not have changed the theory of defense in that Johnson never told his attorneys that anyone else was present." | The theory of defense would have been dramatically altered by evidence which established participation by others in the crime. |
| No witnesses ever placed Paul Decker in the victim's home at the time of the crimes. | Cathy Mundy provided information that Decker was at the victim's home at the time of the crimes. |