**Jeffrey V. CARTER, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

**No. 49S00–9701–CR–23.**

Supreme Court of Indiana.

Nov. 16, 2000.

Hillary Bowe Oakes, Indianapolis, IN, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant Jeffrey Carter was convicted of attempted murder and a handgun violation following a melee in a "strip club."

We affirm, finding among other things that medical records obtained after trial would not have produced a different result; that claims of prosecutorial misconduct during closing argument were waived for failure to object; and that what Carter claims were mistakes by counsel were either not mistakes at all or the result of reasonable strategic decisions.

We have jurisdiction over this appeal because the longest single sentence exceeds 50 years. Ind. Const. art. VII, § 4; Ind. Appellate Rule 4(A)(7).

### Background

The facts most favorable to the verdict show that Carter and several friends patronized an Indianapolis "strip club" on February 9, 1995. Carter and his friends got into a series of arguments with several of the dancers. One of the club's bouncers, Michael Jackson, came over to the table. Carter then began to argue with Jackson. Kenton "Boo" Tarvin, who was another bouncer and also a friend of Carter's, came to the table to calm the situation. Tarvin failed to do so and Jackson told Tarvin that Carter and his friends were not welcome. Tarvin asked them to leave. The group initially complied peacefully, but according to several witnesses Carter drew a gun and fired as he was exiting the club. Bullets struck Tarvin in the lower abdomen and Jackson in the buttocks. Tarvin was severely injured in the shooting while Jackson was treated and released from an Indianapolis hospital.

Carter was charged with two counts of attempted murder—one for shooting Tarvin and one for shooting Jackson—and one count of carrying a handgun without a license. He was also charged as a habitual offender. A jury convicted Carter of attempted murder for the shooting of Jackson and convicted him of the handgun charge, but acquitted Carter of the attempted murder of Tarvin. In a separate proceeding, the jury found Carter to be a habitual offender. The trial court sentenced Carter to 25 years on the attempted murder conviction, which the court en-

hanced by 30 years because of Carter's habitual offender status. The judge also sentenced Carter to one year for the handgun offense, to be served concurrently with his other sentence.

Carter appealed the verdicts and the habitual offender determination on several grounds, but subsequently obtained a stay of that appeal in order to pursue post-conviction relief through the procedure set out in *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149 (1977). The post-conviction court denied Carter's petition and he now seeks review of that decision as well as errors claimed in his original appeal.

Additional facts will be set forth as necessary.

### Discussion

### I

Because Carter's main arguments rest with those issues raised in his post-conviction petition, we will deal with them first.

### A

■ Carter's primary contention is that two pieces of new evidence require that he be granted a new trial. First, Carter points to medical records compiled when Jackson was taken to an Indianapolis hospital and the post-conviction analysis of these records by forensic scientist Dr. John Pless. He claims that this evidence demonstrates that Jackson's wound was self-inflicted. Second, Carter argues that the testimony of one Ronald Collins at the post-conviction relief hearing requires a new trial. Collins, who was in prison at the time of the original trial and whose name was never mentioned during that trial, testified that he was in fact the shooter that night at the club.

■ The post-conviction court rejected these contentions and we will review the decision of that court with great deference. *See Williams v. State*, 724 N.E.2d 1070, 1076 (Ind.2000) (noting that post-conviction relief procedures present a defendant with a "narrow remedy" and not a

"super appeal"); *Conner v. State*, 711 N.E.2d 1238, 1244 (Ind.1999). In the post-conviction court, Carter stood in the shoes of a civil plaintiff and bore the burden of showing by a preponderance of evidence why his conviction should be set aside. *See id.; Johnson v. State*, 693 N.E.2d 941, 945 (Ind.1998). He therefore is appealing from a negative judgment on these issues and "must show that the evidence as a whole 'leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court.'" *Williams*, 724 N.E.2d at 1076 (quoting *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind.1993)). *See also Johnson*, 693 N.E.2d at 945 ("It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that the decision will be disturbed as being contrary to law.")

▮ As the post-conviction court correctly noted, new evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. *See Fox v. State*, 568 N.E.2d 1006, 1007 (Ind.1991). This Court analyzes these nine factors with care, as "[t]he basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Reed v. State*, 508 N.E.2d 4, 6 (Ind.1987).

As for the medical evidence, the post-conviction court found that the records and testimony did not merit a new trial because they would not lead to a different result at a retrial and thus did not meet the final element of the *Fox* test. This conclusion—if it was error at all—was not so obviously mistaken as to require reversal. *See Williams*, 724 N.E.2d at 1076. The medical records show that a bullet slashed through Jackson's left buttock diagonally from either top to bottom or bottom to top. Carter uses these records to argue that the wound probably was suffered as Jackson attempted to draw a gun from his back waistband.[1] In this vein, Dr. Pless testified that there was a "probability—meaning greater than 51%" (R.P–C.R. at 719) that the wound was self-inflicted.[2] However, the State claims, and the post-conviction court held, that the jury could properly have found that the wound was suffered as Jackson dove over a nearby bar, as all parties agree he did around the time of the gunshots.[3] Carter counters this argument by saying the evidence at trial shows that Jackson was shot before he jumped over the bar.

Our review finds the evidence on this point to be in conflict. Jackson's own testimony was equivocal and his memory unclear. Carter has not shown that "the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion." *Johnson*, 693 N.E.2d at 945. He bore the burden of proof in the post-conviction court. *See id.* There was evidence to support the post-conviction court's conclusion that the "probability" of a self-inflict-

---

1. Jackson denied at trial ever attempting to draw a gun.

2. Dr. Pless refused to characterize his testimony as an "opinion" but deemed it instead a "good guess" or a "theory." (R.P–C.R. at 714–15.)

3. Even Dr. Pless conceded that Jackson's wound could have been suffered during a jump over the bar, as Jackson would have

been in the right position at the time. It is also worthy of note that neither party presented any evidence of the type of burn that is typical of the sort of close-range gunshot that Carter suggests occurred. The only evidence on point is Dr. Pless's testimony that "the range of fire is something I can't give an opinion on because *there's no evidence of any close range.*" (R.P–C.R. at 716.) (emphasis added).

ed wound that Dr. Pless pointed to was not enough to override the facts as found by the jury.

■ The testimony of Ronald Collins is less problematic. The post-conviction court found that this testimony failed the *Fox* standard because it would likely be unavailable at a new trial and it was not worthy of credit. Collins's lack of credibility resolves the claim. Carter claims that there is nothing in the record that would undercut Collins's credibility, but that assertion fails in several respects. First, we note that the post-conviction court had the benefit of viewing Collins's face and his reactions during testimony. *See State v. McCraney*, 719 N.E.2d 1187, 1191 (Ind. 1999) ("Whether a witness' testimony at a postconviction hearing is worthy of credit is a factual determination to be made by the trial judge who has the opportunity to see and hear the witness testify."). Second, the post-conviction court found that Collins never came forward with his story until Carter's case reached the post-conviction stage. Finally, many of the witnesses testified at trial that Carter was with two other men, while Collins describes a party totaling five men. These facts justify the post-conviction court's distrust of Collins's credibility. As this Court noted in *McCraney*, "[i]t is not within an appellate court's province to replace the trial court's assessment of credibility with its own," but that is precisely what Carter asks us to do here. 719 N.E.2d at 1191.

### B

■ Carter next claims that the prosecutor committed misconduct by not disclosing Michael Jackson's medical records during discovery. Correspondingly, he argues that these records show that the prosecutor put on perjured testimony because Michael Jackson testified that he was shot twice, while the records apparently show only one wound. We reject both of these claims of prosecutorial misconduct.

Carter argues that the medical records were withheld from him in violation of both local discovery rules and the constitutional rule of prosecutorial disclosure laid down in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). First, the local discovery rules require the prosecutor to "disclose the following material and information within *its possession or control:* [a]ny reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations." Marion County Crim.Div.R. 7(2)(a)(4) (emphasis added). The emphasized portion of the rule was omitted from the petitioner's brief, but this language makes all the difference in this case. *See* Appellant's Br. at 28; Reply Br. at 10. The plain language of the rule requires disclosure of records in the prosecutor's "possession or control." The records at issue here were subpoenaed by Carter from the hospital where Jackson was treated and Carter points to no evidence that the prosecutor ever possessed these records, controlled them, or even *knew* about them until the post-conviction stage. *See* Appellee's Br. at 5; Reply Br. at 10. Carter bore the burden of proof on this issue in the post-conviction court and failed to carry it. *See, e.g., Johnson*, 693 N.E.2d at 945. This discovery rule, on its face, is simply inapplicable.

■ Carter also challenges the constitutionality of what he claims was the State's nondisclosure of Johnson's records. But absent any showing that the State possessed or controlled these records, this challenge also fails. *See, e.g., Goudy v. State*, 689 N.E.2d 686, 695 (Ind.1997) ("The prosecutor in a criminal case has a constitutional mandate to turn over material exculpatory evidence in its *possession.*") (emphasis added); *United States v. Whitehead*, 176 F.3d 1030, 1036 (8th Cir. 1999) ("The government need not disclose evidence that is, *inter alia,* available through other sources or not in the possession of the prosecutor."); *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir.1995)

("The government has no obligation to produce information which it does not possess or of which it is unaware."). *Cf. Conner v. State*, 711 N.E.2d 1238, 1246 (Ind.1999) ("The Seventh Circuit Court of Appeals has consistently emphasized that the State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence."), *cert. denied,* — U.S. ——, 121 S.Ct. 81, 148 L.Ed.2d 43 (2000).

■ Carter's final argument in respect of these medical records is that they demonstrate that Jackson perjured himself on the witness stand and that the prosecutor thereby committed misconduct by introducing Jackson's testimony. The claimed perjury arose when Jackson testified that he had suffered "two gunshot wounds," (R. at 408) while the medical records purportedly show that he suffered a single gunshot wound.

In Indiana, witnesses commit perjury only when they make "a false, material statement under oath or affirmation, knowing the statement to be false or not believing it to be true." Ind.Code § 35–44–2–1. *See also Paschall v. State*, 717 N.E.2d 1273, 1276 (Ind.Ct.App.1999). Carter has not shown with sufficient clarity either that Jackson's testimony was in fact false or that Jackson knew that it was false at the time.[4]

First, while Carter can point to several places in the medical records that refer to a single wound, these records also contain several other notations indicating that Jackson in fact suffered multiple wounds. (R.P–C.R. at 656.) (referring to "GSW*'s*"

and "*wounds* minimal bleeding") (emphasis added). These references show that Jackson's testimony was not necessarily false.

■ Second, there is no evidence that Jackson knew that he had suffered only one wound and thus knowingly made a false statement on the stand. A diagram in the medical records clearly shows two holes in Jackson's buttock—one where the bullet entered and one where it exited. It is likely that Jackson was referring to these two *holes* when he referred to his two *wounds*. This fact indicates that there was some confusion as to what was meant by "wounds" in the testimony. Confused or mistaken testimony is not perjury. *See Timberlake v. State*, 690 N.E.2d 243, 253 (Ind.1997) ("While the knowing use of perjured testimony may constitute prosecutorial misconduct, contradictory or inconsistent testimony by a witness does not constitute perjury."), *cert. denied,* .525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999); *Dunnuck v. State*, 644 N.E.2d 1275, 1280 (Ind.Ct.App.1994) ("Confusion and inconsistencies are insufficient to prove perjury."), *transfer denied.* In any event, Carter has not shown that Jackson's statement was false .or that he knew of the falsity to the level of proof that would entitle us to upset the determination of the post-conviction court. *See, e.g., Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind.2000) ("Such a petitioner must show that the evidence, taken as a whole, 'leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court.'") (quoting *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind.1993)).[5]

---

**4.** While we need not reach this issue, it should also be noted that Carter has failed to show any prejudice from this purported perjury, let alone the "grave peril" necessary to overturn a conviction for alleged prosecutorial misconduct. *See Dobbins v. State* 721 N.E.2d 867, 874 (Ind.1999) ("When evaluating a prosecutorial misconduct claim, we must first determine whether the prosecutor engaged in misconduct and then determine whether the misconduct placed the defendant in a position of grave peril so as to have a

probable persuasive effect on the jury's decision."); *see also Paschall v. State*, 717 N.E.2d 1273, 1276 (Ind.Ct.App.1999) (upholding conviction in face of prosecutorial misconduct despite use of allegedly perjured testimony).

**5.** Carter has also failed to show that the *prosecutor* knew that the testimony was false, especially since, as we noted *supra*, the prosecutor did not even have possession of these records at the time of trial. *See Wallace v. State*, 474 N.E.2d 1006, 1008 (Ind.1985) ("The *knowing*

## C

 The last issue remaining in Carter's post-conviction petition is his claim of ineffective assistance of counsel. "To prevail on a claim of ineffective assistance of counsel, a defendant must show that (i) defense counsel's representation fell below an objective standard of reasonableness and (ii) there is a reasonable probability that the result of the proceeding would have been different but for defense counsel's inadequate representation. We presume that counsel's performance was adequate." *Troutman v. State*, 730 N.E.2d 149, 154 (Ind.2000) (citations omitted). *See generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

 Carter first argues that his trial counsel was ineffective for failing to call several witnesses who would have testified that Carter did not have or fire a gun on the night of the shooting. The post-conviction court found that trial counsel did not call these witnesses because Carter had told trial counsel that he in fact did fire a gun that night.[6] Trial counsel testified that he wanted to avoid putting on perjured testimony.[7] Carter contends that he never told trial counsel that he was the shooter. However, the post-conviction court found trial counsel to be credible on this point.

 Second, Carter claims that trial counsel was ineffective for failing to impeach Jackson with his statement to the police describing the shooter as wearing glasses. While trial counsel could have conceivably impeached Jackson's identification of Carter (who did not wear glasses) with this previous statement, the failure to do so does not raise a "reasonable probability that the result of the proceeding would have been different." *Troutman*, 730 N.E.2d at 154. As the State pointed out in its brief, even if Jackson was impeached as to his identification of Carter as the shooter, three other witnesses identified Carter. Moreover, trial counsel did subject Jackson to a vigorous cross-examination as to Jackson's identification of Carter and to his memory of the incident.

 Third, Carter complains that trial counsel did not take measures to reduce the possible prejudice from a photo array introduced by the State. He claims that this array suggested he had a prior criminal record. However, we agree with the post-conviction court that there is no likelihood that the result of Carter's trial would be any different if the array had been more limited. The photos were apparently used when the dancer who argued with Carter identified him to the police. As such, the only information they communicate is that Carter had been arrested by police—which would be obvious to the jury

use of perjured testimony is fundamentally unfair and a conviction obtained by the use of such testimony will not be upheld. A conviction obtained through the use of false testimony must fall where the State, knowing the testimony to be false, either solicits such testimony or allows it to go uncorrected when it appears.") (citations omitted) (emphasis added); *see also Timberlake v. State*, 690 N.E.2d 243, 253 (Ind.1997), *cert. denied*, 525 U.S. 1073, 119 S.Ct. 808, 142 L.Ed.2d 668 (1999).

6. Carter sought to have trial counsel's testimony excluded from the post-conviction court on the basis of the attorney-client privilege and now asks us to ignore the testimony as well. However, as the post-conviction court correctly noted, a defendant waives the attorney-client privilege when he files a petition

for post-conviction relief on the grounds of ineffective assistance of counsel. "When the professional integrity of an attorney is attacked by a client, that attorney has a right to defend his conduct as counsel." *Logston v. State*, 266 Ind. 395, 399, 363 N.E.2d 975, 977 (Ind.1977) (citations omitted) (upholding conviction on post-conviction review). The waiver holds even though trial counsel allegedly spoke with a prosecutor prior to his testimony, as Carter had filed his petition by that point and his privilege was therefore already waived.

7. Moreover, trial counsel presented strategic reasons for not calling many of these same witnesses, finding most of them to not be credible. The post-conviction court found trial counsel's explanation to be credible.

from his status as a criminal defendant—and that the dancer identified him—which was independently established through her own trial testimony.

 Fourth, Carter claims that trial counsel was ineffective for not moving for a mistrial when the court refused to dismiss a juror who heard possibly prejudicial comments from another juror. During trial, Juror Tyler noticed a neighbor in the audience whom she surmised was there to support Carter. She felt intimidated by this apparent connection to Carter and was excused from service by the court. She also told the court that she had mentioned this connection to another juror, Juror Mills. Juror Mills told the court that she could remain impartial and the court refused to excuse her. Carter claims that trial counsel should have moved for a mistrial. We agree with the post-conviction court that his failure to do so was not ineffective assistance of counsel. The juror told the court that she would remain impartial and the court admonished her that the audience member was not, in fact, in any way tied to Carter. We find no evidence to suggest that the juror did not properly carry out her duties.

 Fifth, Carter claims that trial counsel should not have agreed to a procedure that allowed the jury to view the trial exhibits in the courtroom during deliberations with the court reporter—but not the defendant—present.[8] First, even if Carter had a right to be present during the view of the exhibits, trial counsel offered a very strong strategic reason for waiving that right—Carter's intoxication. The record shows that Carter (who had been released on bail) became belligerent after the verdict was delivered and the trial judge believed that he was intoxicated. Trial counsel himself later testified that Carter was intoxicated. An intoxicated Carter would have been of little use during the jury view of the exhibits and he likely would have hurt his cause. Second, Carter argues

that his counsel should have objected to the court reporter's presence. Nothing in the record indicates that the court reporter communicated with the jury and we find no basis for concluding that the mere presence of a court official during the view of the exhibits could have prejudiced Carter in any way.

 Sixth, Carter claims that trial counsel was wrong to ask his own witness about an otherwise inadmissible drug-related arrest. However,

> Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord that decision deference.... The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Furthermore, isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*State v. Holmes*, 728 N.E.2d 164, 172 (Ind. 2000). Trial counsel made a strategic decision to disclose this arrest in order to impress upon the jurors that Carter was being as open as possible with them. We cannot say that this was an impermissible trial tactic when so much of this case rested on which witnesses the jurors felt were telling the truth.

 Seventh, Carter claims he was prejudiced by a misstatement trial counsel made during his closing argument. Specifically, trial counsel said that "Mr. *Carter* says he just held [the gun] just like that." (R. at 835.) (emphasis added). Carter never testified at trial, but Jackson did testify as to how Carter held the gun. This slip of the tongue did not deprive Carter of his constitutional right to effective assistance of counsel. The jury knew that Carter did not testify, and could piece together trial counsel's error from the fact that Jackson had testified as to how the gun was held. Moreover, the context of the statement

---

**8.** This procedure will also be discussed *infra*.

also reduced its prejudicial effect. Immediately after making his slip, trial counsel said: "These people are covering up. *Mr. Jackson, Michael Jackson* [is] covering up...." (R. at 835.) (emphasis added). This immediate reference to Jackson linked the earlier slip to Jackson's testimony and should have made clear to the jury that trial counsel merely misspoke.

 Eighth, Carter claims that trial counsel was ineffective for not objecting to three statements made by the prosecutor during closing arguments. The propriety and prejudicial effect of these statements will be discussed *infra*. It suffices to say here that trial counsel made a tactical decision not to object to any of these statements. Again, counsel is free to make reasonable strategic decisions. *See Holmes*, 728 N.E.2d at 172. It was reasonable for trial counsel to decide that objecting to these comments in the prosecutor's rebuttal argument would only agitate the jury when it was so close to getting the case.

 Ninth, Carter claims his counsel was ineffective for failing to discover Jackson's medical records prior to trial. As discussed *supra*, these records would not have altered the verdict at trial.

We affirm the post-conviction court's findings that none of these nine specific situations, either individually or cumulatively, deprived Carter of his constitutional right to the effective assistance of counsel.

## II

There remain three issues from Carter's direct appeal that were not resolved in the review of his post-conviction proceedings.

## A

 As previously mentioned, Carter argues that three statements in the prosecutor's closing argument amounted to prosecutorial misconduct.[9] First, he contends that the prosecutor improperly invoked sympathy for the victim: "But you look Boo Tarvin in the face, too, and you tell him your four buddies or the four people that the State called were all a bunch of liars." (R. at 845.) Second, Carter maintains that the prosecutor impermissibly commented on the defense attorney's function: "Defense attorneys get paid to confuse. And make you so confused and then stand up at the end and yell reasonable doubt, reasonable doubt." (R. at 840.) Finally, Carter claims the prosecutor referred to matters outside the record when he said:

Ladies and gentlemen, I could have brought you forty witnesses but they would have been like everybody else. These people are in here. They're drunk. They had no idea what's going on. They're watching the dancers on the stage 'cause that's what they came in there to do. There's always arguments in there. They're not paying attention. They're in there to enjoy their selves. Could have brought you forty of those witnesses.

(R. at 847–48.)

Carter did not object to any of these comments during the trial and therefore any error is waived. *See* Ind. Rule of Ev. 103(a); *see also Charlton v. State*, 702 N.E.2d 1045, 1051 (Ind.1998) ("Ordinarily, a failure to object would cause [prosecutorial misconduct during closing argument] to be waived."); *Wiggins v. State*, 727 N.E.2d 1, 10 (Ind.Ct.App.2000) ("Before we will consider a claim of prosecutorial

---

9. To prove prosecutorial misconduct, a defendant must show that "the prosecutor in fact engaged in misconduct" and then demonstrate that "the misconduct, under all the circumstances, 'placed [the defendant] in a position of grave peril to which he should not have been subjected.'" *Maldonado v. State*, 265 Ind. 492, 355 N.E.2d 843, 848 (1976)

(citations omitted). *See also Reid v. State*, 719 N.E.2d 451, 458 (Ind.Ct.App.1999) ("When we review claims of prosecutorial misconduct, we consider first whether the prosecutor committed misconduct and second, whether the alleged misconduct placed the defendant in grave peril."), *cert. denied*, — U.S. —, 121 S.Ct. 489, — L.Ed.2d — (2000).

misconduct, the defendant must have made timely objection to alleged misconduct at trial to secure an issue for review, and failure to so object waives the issue."), *transfer denied.*

 Once waived, an issue will warrant reversal only if it amounts to fundamental error. *See Borders v. State,* 688 N.E.2d 874, 882 (Ind.1997). "Fundamental error is a substantial blatant violation of basic principles rendering the trial unfair to the defendant and, thereby, depriving the defendant of fundamental due process. The error must be so prejudicial to the rights of a defendant as to make a fair trial impossible." *Charlton,* 702 N.E.2d at 1051 (citations omitted). *See also Mitchell v. State,* 726 N.E.2d 1228, 1236 (Ind.2000) ("The fundamental error exception is extremely narrow.").

Even assuming the first two statements in the prosecutor's closing amount to misconduct, the harm done to Carter does not rise to the level of fundamental error. Several Indiana cases have rejected fundamental error claims with respect to closing arguments more extreme than those made this case. *See, e.g., Charlton,* 702 N.E.2d at 1051; *Etienne v. State,* 716 N.E.2d 457, 461–62 (Ind.1999); *Roach v. State,* 695 N.E.2d 934, 942–43 (Ind.1998); *Robinson v. State,* 693 N.E.2d 548, 551–52 (Ind. 1998); and *Turnbow v. State,* 637 N.E.2d 1329, 1333 (Ind.Ct.App.1994). The same conclusion holds here.

 As for the third contested statement, Carter claims that the trial court committed fundamental error by allowing the prosecutor to refer to witnesses he did not call. We reject this contention. Reading the statement in context, it is clear that the comment is a *reply* to a comment in the defense counsel's closing argument: "[T]he State could have called as many witnesses as they wanted to testify ... but how many did they bring in and who did

they bring in?" (R. at 823.) The prosecutor's statement is clearly aimed at rebutting this attack and explaining that any other possible witnesses would bring little to the case.

### B

 Carter next argues that the trial court committed fundamental error by allowing the court reporter to be present when the jury viewed the exhibits in the courtroom during deliberations. There is simply no authority that makes the procedure the trial judge followed error, let alone fundamental error.

### C

 Finally, Carter contends that there is insufficient evidence to support the enhancement of his sentence based on his habitual offender status. Specifically, he claims the State failed to prove one of his prior felonies. We reject this claim. The disputed previous conviction arises from a four-count information filed against Carter on July 13, 1987. Carter was later sentenced on a "Count Five" despite the fact that the original information only contained four counts.[10] Carter argues that because there is no evidence of a Count Five ever being filed, he could not possibly be convicted on that count. However, no matter what the information says, Carter was in fact sentenced to two years for "Count Five." The habitual offender statute does not contemplate enhancement of a penalty for the mere *charge* of a felony, but looks for an actual *conviction. See* Ind.Code § 35–50–2–8 ("The state may seek to have a person sentenced as a habitual offender for any felony by alleging, on a page separate from the rest of the charging instrument, that the person has accumulated two (2) prior unrelated felony *convictions.*") (emphasis added). Here the State has shown that at the very least,

---

10. One of the original four counts was later subdivided into two parts. The prosecutor argued during the habitual offender phase that the trial court's computer system could not register the subdivided count and treated each division as a separate count. Count Four—a felony criminal recklessness charge—then became Count Five.

Carter was sentenced to two years in prison, which qualifies as a felony sentence. *See id.* § 35–50–2–1(b) ("As used in this chapter, 'felony conviction' means a conviction, in any jurisdiction at any time, with respect to which the convicted person might have been imprisoned for more than one (1) year.") There was sufficient evidence of a prior unrelated felony conviction.

*Conclusion*

We affirm both the decision of the post-conviction court and the conviction and sentence in the original trial court.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.