# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 23 2019, 9:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Stephen T. Owens
Public Defender of Indiana

ATTORNEY FOR APPELLANT
SHAKIMA LEWIS

Cara Schaefer Wieneke
Wieneke Law Office, LLC

ATTORNEY FOR APPELLANT
SEDRICK CURTIS

Anne Murray Burgess
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sedrick Curtis and Shakima Lewis, | April 23, 2019 |
| *Appellants-Petitioners*, | Court of Appeals Case No. 18A-PC-827 |
| v. | Appeal from the Lake Superior Court |
| State of Indiana, | The Honorable Samuel L. Cappas, Judge |
| *Appellee-Respondent*. | The Honorable Natalie Bokota, Magistrate |

**Brown, Judge.**

[1]    Sedrick Curtis and Shakima Lewis appeal the denial of their petitions for post-conviction relief. They raise two issues which we consolidate and restate as whether the post-conviction court erred in denying their petitions. We affirm.

## *Facts and Procedural History*

[2]    The relevant facts as discussed in Curtis's direct appeal follow:

> Curtis is the biological father of M.C., born on November 5, 1998, and was living with Shakima Lewis, who is M.C.'s biological mother, and her three other children, C.B., born on June 4, 1994, S.B., born on July 10, 1995, and S.L., born on July 16, 1996. Prior to August 2001, C.B., S.B., S.L., and M.C. (collectively, "the children") lived with Curtis and Lewis in Lake County, Indiana. On August 31, 2001, as a result of allegations of physical abuse, the children were removed from Curtis and Lewis's home and placed in foster care with Evelyn Murad. During the children's stay, Murad observed scars and open lacerations on C.B.'s back, arm, and side; open lacerations on S.B.'s back and thigh; and open lacerations on S.L.'s thigh and arm. The children also told Murad "secrets" they had about Curtis and Lewis. C.B. told Murad that Curtis and Lewis forced the children to perform oral sex on them. C.B. also stated that Curtis and Lewis would "whoop" the children with an extension cord. C.B. told Murad that Curtis forced C.B. and S.B. to perform sexual acts upon one another, sometimes in front of other people. C.B. also told Murad that Curtis forced S.B. and

S.L. to perform sexual acts on one another as well. S.B. told Murad that Curtis would pick her up when they were both naked, press her close, and "dance around" with S.B. until "white stuff came out." Tr. at 347.

After hearing these secrets from the children, Murad contacted the children's caseworker about the alleged abuse. The Lake County Advocacy Center conducted videotaped interviews of the children separately. During his interview, C.B. stated that Curtis placed his penis in C.B.'s "behind." C.B. also stated that Curtis forced S.B. and S.L. to "suck" between one another's legs. During her videotaped interview, S.B. stated that Curtis made her suck between his legs and stuck his penis between her legs. S.L. stated in her interview that she had to suck Curtis's "ding-a-ling," and that C.B., S.B., and M.C. had to do it too. Also, S.L. stated that Curtis touched her "coo-coo." All three children recounted a similar story during their videotaped interviews where Curtis forced M.C. to give him oral sex, and M.C. bit down on Curtis's penis.

Doctor Edwin Udani conducted a physical examination on the children for signs of physical and sexual abuse. He found multiple scars on C.B. and S.B.'s backs. Subsequently, Doctor Kalyani Gopal interviewed the children separately about the allegations of abuse. After the children reported their allegations, Dr. Gopal began therapy with the children. During a therapy session, C.B. told her that Curtis forced C.B. to give him oral sex, and Curtis anally raped C.B. S.B. told Dr. Gopal that Curtis forced C.B. and S.B. to "pee" in each other's mouths. In a therapy session with Dr. Gopal, S.L. told the same story. Also, the children each told Dr. Gopal a story about Curtis forcing M.C. to perform oral sex on him, and M.C. biting Curtis's penis.

*Curtis v. State*, No. 45A03-0406-CR-273, slip op. at 2-4 (Ind. Ct. App. March 4, 2005) ("*Curtis I*").

[3]     The relevant facts from Lewis's direct appeal follow:

> Lewis is the biological mother of C.B., born on June 4, 1994, S.B., born on July 10, 1995, S.L., born on July 16, 1996, and M.C., born on November 5, 1998, (collectively referred to as the "Children"). Prior to August of 2001, the Children lived with Lewis and Sedrick Lamont Curtis ("Curtis") in Lake County, Indiana. On August 31, 2001, as a result of allegations of physical abuse, the Children were removed from Lewis and Curtis's home and placed with a foster parent, Evelyn Murad ("Murad"). While the Children were in her care, Murad observed scars and open lacerations on C.B.'s back, arm, and side; "open spots" on S.B.'s back and thigh; and open lacerations on S.L.'s thigh and arm. Tr. at 51. Murad also noticed that: (1) the Children were extremely thin, with the exception of M.C.; (2) the Children were very comfortable walking around each other nude; and (3) C.B. treated S.B. like his girlfriend rather than his sister. One day, C.B. and S.B. spontaneously shared their family "secrets" with Murad. *Id.* at 59. In particular, C.B. recounted that sometimes he watched Lewis and Curtis having sex and that they would call him into the room and force him to perform oral sex on them. C.B. also told Murad that Lewis and Curtis would beat him if he did not do what they had requested. C.B. further recalled that he and S.B. were made to perform sexual acts on each other while other people paid Curtis to watch.
>
> S.B. told Murad that she and S.L. had to simulate a sexual act on each other "for the people," and that, on several occasions, she was forced to perform oral sex on Curtis or she would receive a beating. *Id.* at 60. S.B. also told Murad that, sometimes, Curtis would pick her up while both of them were naked and would press her to his body and dance around the room until "white stuff came out of" his penis. *Id.* at 64. Similarly, S.L. told Murad that she also was forced to perform oral sex on Curtis, and C.B., S.B., and S.L. all agreed that M.C. had to perform oral sex on Curtis and that, in so doing, M.C. bit Curtis. While the

Children were in her care, Murad also witnessed C.B. jabbing a little plastic toy that resembled a penis between S.B.'s legs.

After hearing the Children's horrific secrets, and after noticing the Children's bizarre behavior, Murad contacted the Children's caseworker about the alleged abuse. Subsequently, because Murad, who was seventy-five years old at the time of the trial, could no longer care for the Children, the Children were moved to the home of Sharon Hicks ("Hicks").

On November 16, 2001, the Lake County Advocacy Center interviewed the Children separately. During his interview, C.B. testified that Lewis made "[S.B.] and [S.L.] suck between each other's legs" in front of ten other people and that Curtis made C.B., S.B. and S.L. "suck on him." *Id.* at 296, 304. C.B. also testified that Curtis "peed on [his] sisters." *Id.* at 312. C.B. further testified that Curtis "stuck his thing" in C.B.'s "butt," and M.C. "suck[ed] on him and [M.C.] bit him." *Id.* at 306-07.

In her videotaped interview, S.B. corroborated C.B.'s testimony that Lewis and Curtis would make S.B. "suck between their legs." *Id.* at 341. S.B. also testified that Curtis "put his pee-pee in her pee-pee" while people paid Lewis to watch. *Id.* at 346. Likewise, during her interview, S.L. testified that M.C. sucked on Curtis's "ding-a-ling" and bit it. *Id.* at 368. She also confirmed that all of the Children were forced to perform oral sex on Curtis. S.L. further testified that Lewis touched her private area for a long time and that S.B. "sucked on [C.B.'s] ding-a-ling." *Id.* at 373. In another videotaped interview, M.C. testified that he bit Curtis but he did not know where.

Doctor Edwin Udani ("Doctor Udani") examined the Children for signs of abuse and found that C.B. and S.B. had multiple scars on their backs, but S.L. and M.C. did not exhibit any physical signs of abuse. On January 7, 2002, Doctor Kalyani Gopal ("Doctor Gopal") interviewed the Children separately and they reported to her the allegations of physical and sexual abuse. Doctor Gopal began therapy with the Children, which focused

upon controlling the Children's sexual urges—i.e., C.B. had acted sexually toward S.B.; S.B. and S.L. molested some children; and S.L. said that she wanted to have sex with S.B. and other kids.

*Lewis v. State*, No. 45A03-0404-CR-187, slip. op. at 2-5 (Ind. Ct. App. September 8, 2004) ("*Lewis I*").

[4]     The State charged Curtis and Lewis with four counts of child molesting as class A felonies, four counts of vicarious sexual gratification as class C felonies, and three counts of battery as class D felonies. *Curtis I*, slip op. at 4; *Lewis I*, slip op. at 5. At a joint jury trial, C.B., S.B., and S.L. testified to physical abuse by Curtis and Lewis. Murad testified that C.B. had scars as well as open lacerations all over his back, his arm, and side, and that S.B. had open spots on her back and her thigh. The State presented evidence of sexual abuse through the children's statements to their foster parent and various counselors and healthcare professionals. The State also presented evidence that: S.L. approached S.B. sexually and asked S.B. to get on top of her and touch her in September or October 2002; Murad observed C.B. trying to act as though S.B. was his girlfriend and at one point S.B. jabbed a plastic toy that looked like a penis between S.B.'s legs; C.B., S.B., and S.L. walked around naked after being placed in Murad's care; C.B. laid on S.L. sexually while in Hicks's care; C.B. acted out sexually towards S.B.; and C.B. and S.L. played sexually.

[5]     The jury found Curtis guilty of all charges except for two counts of vicarious sexual gratification. *Curtis I*, slip op. at 4. The jury found Lewis guilty of two

counts of child molesting involving C.B. and S.B., three counts of vicarious sexual gratification involving C.B., S.B., and S.L., and three counts of battery involving C.B., S.B., and S.L. *Lewis I*, slip op. at 5. The court sentenced Curtis to an aggregate term of 128 years and Lewis to an aggregate term of sixty-four years. *Curtis I*, slip op. at 4; *Lewis I*, slip op. at 6.

[6] Curtis filed a *pro se* petition for post-conviction relief on March 7, 2006, and amended petitions by counsel in 2007. The post-conviction court denied his petitions, and this Court affirmed. *See Curtis v. State*, 905 N.E.2d 410 (Ind. Ct. App. 2009) ("*Curtis II*"), *trans. denied*. Lewis filed a petition for post-conviction relief in 2007 and an amended petition by counsel in 2008. The post-conviction court denied her petition, and this Court affirmed. *See Lewis v. State*, No. 45A04-0811-PC-675, slip op. at 2, 4 (Ind. Ct. App. May 13, 2009) ("*Lewis II*"). In both cases, we held that the trial counsels' decision to stipulate to certain pretrial hearsay statements constituted trial strategy. *See Curtis II*, 905 N.E.2d at 414-415; *Lewis II*, slip op at 8-9.

[7] Without speaking to the children, Curtis prepared affidavits and sent them to his brother, Detrick Curtis. Tomeka Johnson, Lewis's sister and Detrick's girlfriend, sent them back to Curtis. The affidavits signed by S.L., S.B., and M.C. state in part that Curtis did not commit any crimes and:

> Various authority figures pressured all of the alleged victims, including myself, to give statements against Sedrick Curtis. I wanted to please the police, caseworkers, and prosecutors by providing the expected answers. That is exactly what I did. I

told those in authority what I thought they expected to hear regardless of the truth.

Respondent's Exhibits 2, 3A, and 5A. On September 22, 2014, this Court authorized the filing of Curtis's successive petition for post-conviction relief.

[8] Lewis obtained copies of the affidavits, changed them so that they applied to her case, and mailed them to Johnson without personally speaking with any of the children to determine what they would say. On April 17, 2015, this Court authorized the filing of Lewis's successive petition for post-conviction relief. In October 2015, Curtis and Lewis each filed an amended successive petition for post-conviction relief.

[9] The court held an evidentiary hearing over multiple days in 2016 and 2017. C.B. testified that he was twenty-one years old. When asked if he remembered living with Lewis and Curtis, C.B. answered: "Not much, to be honest." Transcript Volume I at 35. C.B. indicated that counsel had asked him to watch the video interview from when he was maybe five or six years old and that he did not watch the whole interview because he became frustrated and does not "like to think about my past." *Id.* at 38. When asked if he ever saw his parents have sex, he answered: "Twice that I can remember." *Id.* at 43. When asked if he ever saw any movies where there were people having sex, he answered: "I think one time in the living room there was a movie, but we were just playing around in the living room as kids. I didn't really understand what was going on, so I didn't watch it; I didn't pay attention to it much." *Id.* at 44. During the

direct examination of C.B. by Curtis's counsel, the following exchange occurred:

Q  Did either your mother or Mr. Curtis ever perform sex acts on you?

A  Not that I can remember.  The only sexual things I remember were seeing them have sex twice.  I don't remember anything else.

Q  Do you – did your parents ever make you perform sex acts with your siblings?

A  No.

Q  Do you understand that when you were a child you told people that your parents made you commit sex acts with each other?

A  Yes, I do.

Q  And with your sisters?

A  Yes, I do.

Q  How do you think that that happened?

A  The only way I could have come up with things like that, I mean I had an imagination.  As a kid, I had an imagination, then you side that with the fact that I'd seen both of my parents have sex twice, and then you ask me a bunch of sexual related questions, I might not understand that we're talking about sex. But what I'm hearing brings up the image of what I saw.  And then I try to make sense of the question that I'm being asked based off of what I've seen and I try to put myself in that situation.  Basically all I can do is like giving an example, honestly, like I'd seen my mother give my father hand jobs.  If you're asking me if anybody in my family ever touched my bathroom parts – as I guess that's what I called it as a child – the

image that's going to come to mind is a picture of my mom doing that to my dad.  I still don't understand it; it still doesn't make sense why she wouldn't do that to me.  So the best way that I can try to make sense of the question is by trying to imagine what it would be like if I was in that situation and answer the question based off of a visual image that I made up to try to understand what was being asked, not off of something that actually happened.

*Id.* at 44-46.  When asked if he was telling the judge that there was no sexual abuse, he answered: "Yes, ma'am, I am."  *Id.* at 48.

[10]     During cross-examination, C.B. testified that, while he was in the second foster house following the removal from his mother's home, there was an incident in which he was fourteen years old and was in a sexually compromising position with the foster mother's six-year-old son in which he rubbed against the six-year-old's body.  C.B. stated that he was removed from that home and went to several different treatment facilities and was in residential treatment for almost seven years.  He testified that he "got in trouble for grooming the kids around me sometimes" or "[d]oing sexual things with kids my age around me."  *Id.* at 70.

[11]     When asked if he said he saw his parents have sex twice, he answered: "Yeah, I remember seeing it twice.  I probably saw it more than that, but I can only remember twice."  *Id.* at 74.  He indicated that he was beaten and saw Lewis and Curtis use drugs, watch pornography, and masturbate.  When asked if he remembered the other day when he discussed with the prosecutor how he did not remember if M.C. and S.L. lived with him when he was a child, C.B.

answered in part: "Yeah. When I think back on my past, I don't remember." *Id.* at 79. He indicated that Curtis and Lewis had spent enough time in prison and stated "what I'm doing here today is to try and correct a mistake that I made." *Id.* at 85.

[12] S.L. testified that she was nineteen years old, that she was removed from Lewis and Curtis when she was "[f]our, probably turning five," and that she did not remember making statements that her parents had committed sex acts on her. *Id.* at 104. During the direct examination of S.L. by Curtis's counsel, the following exchange occurred:

> Q Did your parents ever make you commit any sex acts with them?
>
> A I don't know. I was told that, yes.
>
> Q Do you have any independent memory of that happening?
>
> A I don't have a memory of anything.
>
> Q You don't remember the whoopings?
>
> A The only thing I remember – the only memories I actually have are good ones, to be honest.

*Id.* at 108. S.L. indicated that she remembered telling counsel that she felt brainwashed because "everybody kept telling me stuff that I didn't remember." *Id.* at 109. On cross-examination, when asked if she ever read the affidavit, S.L. stated "Probably, back in the day," and, when asked if she thought she signed it on March 9, 2015, she answered, "I don't know," and later stated, "I don't

remember. I've been doing so much like the past year, I don't remember." *Id.* at 120, 122. When asked specifically about the affidavit relating to Curtis, S.L. indicated that it was her signature, but when asked if she remembered if she read that document, she answered: "Probably not." *Id.* at 125. She later indicated that she did not remember reading it before she signed it and stated: "But I usually read everything before I sign it, so I probably did but I don't remember." *Id.* at 126. S.L. testified that she remembered whoopings in which Curtis would tap her butt with his hands and that he did not use anything else besides his hand that she remembered.

[13]   S.B. testified that she was twenty-one years old, that Lewis and Curtis were her parents, and that she was four or five when she was taken from their home. During the direct examination of S.B., the following exchange occurred:

> Q  Do you recall meeting with myself and co-counsel here, Anne, and reviewing a video that was taken of you when you were a child?
>
> A  Yes.
>
> Q  When you watched that video, what reaction did you have? Do you remember sitting there being interviewed?
>
> A  No, I don't remember being interviewed. I think my first thought was how small I was. But once I got over that, and once we got over all the like weird questions, then it started to get to the point where she kept asking the same question over and over again, I kind of lost interest. Because you know, after hearing the same thing over and over again, you kind of get tired of it. But I do remember watching the video. I don't remember the physical

event of the video, because it was so long ago.  But the video itself was – I just didn't – I lost interest.

Q  Were those allegations that you made back then, were they true?

A  No.

Q  And how do you know that?

A  Something as traumatic as what we said happened, there's no way possible that anybody could ever forget something like that. No matter what you do, what you say, how you live your life, you will always remember if something that traumatic happened to you.  There is nothing you can possibly do that can make you completely forget something that horrible.  Like no type of hypnosis, therapy, nothing.  Because there's one small thing that will actually jog it back to you.  You can't forget something like that, no matter how hard you try.

Q  Has your memory ever been jogged back to that?

A  To being at home, to being with my parents, or to the abuse?

Q  To these things – yeah, to the abuse.

A  No.  I remember getting whippings, but who didn't.  We were bad, so of course getting whippings I remember.  I don't remember any type of sexual anything happening in that house. Like the most we ever did, we got whippings.  But then again, kids our age with our amount of energy, always got whippings. But as opposed to the sexual allegations, no.  We weren't even allowed to cross sides of the room with our siblings.  Although we all shared the same room, we could not cross the guys' side, or the guys couldn't come on the girls' side.  It was just strictly enforced.  Like you know the rules.

Q  Did – so are you saying today that neither [Lewis] nor [Curtis] ever touched you in any sexual manner?

A  No way whatsoever.

Q  Did they ever, in any way, make you touch them in a sexual manner?

A  No.

Q  Did they ever make you touch either your sister or your brothers in a sexual manner?

A  No.

Q  Did they ever make you do anything sexual while people came over and watched?

A  No.

Q  Do you have any idea, you know, why as a child, you might have said those things?  Because you saw the video, you said them.  But do you know why you might have, or where you might have learned about that?

A  Honestly, I don't.

*Id.* at 175-177.  When asked if she ever recalled seeing any type of porn movies as a young child, she answered: "One time.  One, like five-second view."  *Id.* at 206.  She indicated that Curtis, Lewis, and her siblings were present.

[14]  On redirect examination of S.B., the following exchange occurred:

Q  And you also said during your testimony that the affidavits would reopen the case; that was your understanding?

A  Right.

Q  Why would you want to reopen the case?

A  Because none of the stuff that was said was true.

*Id.* at 216.  On recross-examination, S.B. answered affirmatively when asked if she was "trying to get your whole family back together," testified that "this is my way of correcting a wrong," and stated that she felt her parents had spent too much time in prison.  *Id.* at 218.

The State presented the testimony of Taelyn Fowler, a licensed notary.  She testified that her signature and stamp were on Respondent's Exhibit 1, the affidavit of S.L. as it relates to the case against Lewis, and Respondent's Exhibit 4, the affidavit of S.B. as it relates to Lewis.  With respect to the affidavits of S.L., S.B., and M.C. related to Curtis, Fowler stated that her signature, writing, or notary stamp were not on those documents.

Dr. Michele Cutler, a licensed clinical psychologist, testified that she had previously worked with children who had been sexually abused and that attachment theory was well-accepted in the psychological community, and she talked about the evolutionary drive for children to seek proximity to adults.  When asked about "trauma bond," she testified that the most important thing that children have is the attachment relationship, that they will do anything to try to preserve that caretaking relationship, "even if it means living with, or in some way accommodating or accepting the fact that the abuse is hurting – is happening – that itself is less anxiety provoking than losing that relationship with their primary caretaker, because that's so innate survival."  Transcript Volume II at 212.  During the direct examination of Dr. Cutler, the following exchange occurred:

Q . . . If there's recantation not when abuse is ongoing, but years later, what might be some reasons for that?

A  Well, the attachment to a primary caretaker, right, the driver to preserve that never really goes away.  Particularly, as I was saying, if we haven't had the chance to form healthy relationships with other caretakers.  And over time, separation from the original caretakers can actually intensify that bond and lead to idealization.  So if kids haven't had the place to hold their parents, or caretakers, responsible for what happened and shift that blame, then that desire may hold them accountable.  That desire never really goes away to want to restore that bond with their primary caretakers.  So an opportunity to do that would certainly be less anxiety provoking than acknowledging what had happened to them by their primary caretakers.

*Id.* at 231-232.  Dr. Cutler later stated:

[J]ust because a child, or even as an adult, later says that they don't remember the abuse happening, doesn't mean that the abuse didn't happen.  That there is other things that could contribute to the child – you know, the child who was the victim, even if they're an adult at the time – saying that, other than just that the abuse didn't happen.

*Id.* at 239.  During the cross-examination of Dr. Cutler, when asked if one of the explanations might be that the abuse did not occur, Dr. Cutler answered: "Sure."  Transcript Volume III at 5.

[17]   On March 15, 2018, the post-conviction court entered a nineteen-page order denying the petitions filed by Curtis and Lewis.  In part, the court's order states:

31.  Three of the four children testified at the SPCR hearings: [C.B.], [S.B.] and [S.L.].

32. [M.C.] did not testify at the SPCR hearings. However, concerning his affidavit Taelyn Fowler testified that the notary signature of her name is not her signature and the notary seal is not her seal. (SPCR Respondent's Exh. 5A). This Court finds that Taelyn Fowler did not notarize the affidavit of [M.C.]. Therefore, the affidavit is not sworn under the penalties for perjury before a notary public duly authorized to administer oaths.

33. Although he did not sign an affidavit for either Curtis or Lewis, [C.B.] testified at the SPCR hearings. [C.B.] is the oldest of the four children. He turned seven years old on June 4, 2001. He was removed from the home on August 31, 2001. Although his testimony was lengthy, the following portions are of particular relevance to the claim of newly discovered evidence and *ipso facto*, actual innocence.

QUESTION BY [CURTIS'S COUNSEL]:

Did either your mother or Mr. Curtis ever perform sex acts on you?

ANSWER:

Not that I can remember. The only sexual things I remember were seeing them have sex twice. I don't remember anything else.

QUESTION BY [CURTIS'S COUNSEL]:

Do you – did your parents ever make you perform sex acts with your siblings?

ANSWER:

No.

QUESTION BY [CURTIS'S COUNSEL]:

You had to travel to get [to court]?

ANSWER:

Yeah, we had to travel; it seemed like it might have been hours. It was a big courtroom, a lot of people. Way bigger than this, if I remember correctly. And I remember crying a lot; that's all I remember. I remember looking at my mom, seeing my mom's face and realizing that I said some stuff that wasn't true. And it didn't – it hadn't occurred to me that I had said stuff that wasn't true until I looked at her, and then I'd just cried a lot.

QUESTION BY [CURTIS'S COUNSEL]:

Are you telling the judge today that there was no sexual abuse?

ANSWER:

Yes ma'am, I am.

35. [S.B.] testified at the SPCR hearing. Born in July of 1995, she turned six (6) years old three weeks before CPS removed her from the home. Like her siblings, [S.B.] was interviewed by the Lake County Family Assistance Bureau on November 16, 2001. She had started kindergarten. The interview lasted one and one-half hours. [S.B.] testified that although she watched the interview with Petitioner's attorneys, she has no memory of the interview.

36. Concerning the affidavit supporting Curtis's SPCR, [S.B.] testified that she did not write the affidavit and did not know what it was until her Aunt Tomeka explained it to her. She could not testify with any certainty that she read it, testifying alternatively that she probably did not read it and later, that she probably did read it "back in the day." Taelyn Fowler testified that the notary signature of her name is not her signature and the notary seal is not her seal. (SPCR Respondent's Exh. 3A). This court finds that Taelyn Fowler did not notarize the affidavit of [S.B.] for Curtis's case. Therefore, the affidavit is not sworn under the penalties for perjury before a notary public duly authorized to administer oaths.

37. Concerning the affidavit of [S.B.] supporting Lewis's request to pursue SPCR, Taelyn Fowler testified that the notary signature of her name is hers and the notary seal is her seal. (SPCR Respondent's Exh. 4). This court finds that Taelyn Fowler notarized the affidavit of [S.B.] for Lewis's case.

38. When [S.B.] was a teenager, she found some papers concerning the criminal case. (Tx. of SPCR, hrg. 1/31/17, p. 17; SPCR Petitioner's Exh. 19). When she spoke with [S.L.] and [C.B.] about the case, none of them remembered the events or saying any of the things reported. They did not include [M.C.] in their discussion because, as [S.B.] put it, "Well, [M.C.] was the youngest, so we kind of figured he wouldn't have any memory of it. Plus, we just chose not to expose him to any of that." (Tx. of SPCR, hrg. 1/31/17, pp. 18-21). She testified that the allegations she made as a child are not true because something that traumatic could not be forgotten – and she has no memory of sexual abuse. The affidavit states that [S.B.] said she was sexually abused as a child because she was pressured by authority figures. However, at the SPCR hearing, when asked why then, she said these things as a child, she testified she did not know.

39. [S.L.] testified at the SPCR hearing. Born in July of 1996, she turned five (5) years old two weeks before being removed from the home. Concerning the affidavit supporting Curtis's request to pursue successive P-CR, Taelyn Fowler testified that the notary signature of her name is hers and the notary seal is hers. (P-CR Respondent's Exh. 1). [S.L.] however, testified that didn't [sic] remember seeing the affidavit and probably didn't read it.

40. Concerning the affidavit of [S.L.] supporting Lewis's request to pursue SPCR, Taelyn Fowler testified that the notary signature of her name is not her signature and the notary seal is not her seal. (P-CR Respondent's Exh. 2). This court finds that Taelyn Fowler did not notarize the affidavit of [S.L.] for Lewis's case. Therefore, the affidavit is not sworn under the penalties for perjury before a notary public duly authorized to administer

oaths. Furthermore, [S.L.] testified that she probably didn't read it.

41. [S.L.] doesn't know if her parents ever made her commit sex acts with them. She was told stuff by other people that she doesn't remember so she feels brainwashed and has questions.

***Conclusions of Law:***

* * * * *

6. None of the children have recanted the statements of sexual abuse made over fifteen years ago. [C.B.] testified that the abuse did not occur but only after testifying that he has no memory of sexual abuse and the only thing he remembers is seeing his parents having sex twice. Although he also testified to a realization that he "said some stuff that wasn't true" when he saw his mother's face in the courtroom, this is not an assertion that he remembers fabricating the sexual acts he volunteered had been committed against him and his siblings. This court concludes that the Petitioners have failed to prove that [C.B.] has recanted his childhood statements of sexual abuse.

7. [M.C.] did not testify and his affidavit is invalid at best and fraudulent at worst. There is no evidence that he has recanted his childhood statements.

8. [S.B.'s] affidavit for Curtis is invalid at best and fraudulent at worst. Furthermore, even in the case of the affidavit prepared in support of Lewis's case, [S.B.] does not adopt the assertions in the affidavit as true. For example, the affidavit indicates that she said the things she said in order to appease the pressure of authority figures. At the SPCR hearing however, she testified that she doesn't know why she described these events as a child. She expresses the belief that the affidavits must be true because if she had been through something so traumatic as a child, she would remember it today. However, she expressed the opinion that her brother [M.C.] would not be expected to remember the events because of his young age. [S.B.] was five years old during

the time of the abuse and six years old when interviewed by the Family Assistance Bureau. The interview lasted one and one-half hours and she watched in preparation of these proceedings yet has no memory of it. The evidence proves that [S.B.] does not remember being sexually abused. This Court concludes that the Petitioners have failed to prove that [S.B.] has recanted her childhood statements of sexual abuse.

9. [S.L.'s] affidavit for Curtis is invalid at best and fraudulent at worst. Furthermore, even in the case of the affidavit prepared in support of Lewis's case, young [S.L.] does not adopt the assertions in the affidavit as true. By her testimony, she probably did not read the affidavit and doesn't know if her parents sexually abused her. This Court concludes that the Petitioners have failed to prove that [S.L.] has recanted her childhood statements of sexual abuse.

10. Curtis and Lewis have failed to prove by a preponderance of the evidence that newly discovered evidence exists relevant to their convictions and sentences.

Appellants' Appendix Volume IV at 118-125.

## *Discussion*

The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* "A post-conviction court's findings and judgment

will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

[19] Curtis and Lewis argue that the post-conviction court erred with respect to findings 32, 33, 38, and 41, and by failing to consider the full testimony of the children. They also argue that the post-conviction court failed to apply the proper legal standard to the evidence presented. They assert that the post-conviction court was required to evaluate the evidence under a nine-prong standard to determine whether it was newly discovered, and that the credible recantation of one's trial testimony by an essential witness will generally satisfy all nine prongs of the standard.

[20] The State argues that Curtis and Lewis have not demonstrated that the post-conviction court's findings were clearly erroneous and that they merely assert in part that the findings were incomplete. It asserts "[t]o the extent Petitioners are really challenging the post-conviction's court's conclusion that 'None of the children have recanted the statements of sexual abuse made over fifteen years ago,' which is actually found in Conclusion #6 . . . that conclusion is not clearly erroneous." Appellee's Brief at 22. The State argues that direct evidence supports the post-conviction court's conclusion that C.B. testified that "he did not remember the sexual abuse rather than made an affirmative recantation of the statements he made fifteen years earlier." *Id.* at 22-23. It contends that,

"[a]lthough C.B. did also testify more directly at other points that there was no sexual abuse, the full context of his testimony shows that his current belief in that regard was premised on his lack of memory, not on affirmative knowledge." *Id.* at 23. It asserts that the evidence supporting the post-conviction court's conclusion that neither S.B. nor S.L. recanted their prior statements is even stronger.

[21] Generally, new evidence will mandate a new trial only when the defendant demonstrates that: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) the evidence is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result at retrial. *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000) (citing *Fox v. State*, 568 N.E.2d 1006, 1007 (Ind. 1991)). We analyze these nine factors "with care, as '[t]he basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized.'" *Id.* (quoting *Reed v. State*, 508 N.E.2d 4, 6 (Ind. 1987)). "The burden of showing that all nine requirements are met rests with the petitioner for post-conviction relief." *Taylor v. State*, 840 N.E.2d 324, 330 (Ind. 2006). "Whether a witness' testimony at a postconviction hearing is worthy of credit is a factual determination to be made by the trial judge who has the opportunity to see and hear the witness testify." *State v. McCraney*, 719 N.E.2d 1187, 1191 (Ind. 1999). As to the ninth prong, in determining whether newly discovered evidence would likely produce a

different result at a new trial, the post-conviction court may consider the weight a reasonable trier of fact would give the evidence and may evaluate the probable impact the evidence would have in a new trial considering the facts and circumstances shown at the original trial. *Nunn v. State*, 601 N.E.2d 334, 337 (Ind. 1992). The newly discovered evidence must raise a strong presumption a new trial would achieve a different result. *Id.*

[22] To the extent Curtis and Lewis challenge Findings 32, 33, 38, and 41, we note that they do not assert that these findings are factually incorrect or that the testimony is misquoted. For example, with respect to Finding 32, which found that M.C. did not testify at the successive post-conviction relief hearings and that M.C.'s alleged affidavit was not sworn under the penalties for perjury before a notary public, Curtis and Lewis do not assert that M.C. testified or that the trial court's finding regarding his affidavit was incorrect. While the record reveals some statements in the nature of correcting a mistake or denials of some conduct, it also reveals a lack of memory on the part of the children. The post-conviction court had the opportunity to see and hear the witnesses testify. C.B. testified: "When I think back on my past, I don't remember." Transcript Volume I at 79. When asked if her parents ever made her commit any sex acts with them, S.L. answered: "I don't know. I was told that, yes." *Id.* at 108. She also stated: "I don't have a memory of anything." *Id.* When asked if she remembered the whoopings, she answered: "The only thing I remember – the only memories I actually have are good ones, to be honest." *Id.* S.B. testified

that she did not remember being interviewed and stated: "I don't remember the physical event of the video, because it was so long ago." *Id.* at 175.

### *Conclusion*

[23] Any tendency of some of the children's statements to cast doubt on the reliability of the initial evidence would be slight in light of their statements regarding their inability to remember. Under the circumstances and in light of the record, we cannot say that the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.

[24] For the foregoing reasons, we affirm the post-conviction court's denial of the petitions for post-conviction relief filed by Curtis and Lewis.

[25] Affirmed.

Altice, J., and Tavitas, J., concur.